No. 22-1499

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

LINDA MIGLIORI, *et al.*,

Plaintiffs-Appellants

v.

LEHIGH COUNTY BOARD OF ELECTIONS, *et al.*,

Defendants-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS-APPELLANTS AND SUPPORTING REVERSAL

———————————

KRISTEN CLARKE
  Assistant Attorney General

TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................................. 1

STATEMENT OF THE ISSUES ............................................................................ 2

STATEMENT OF THE CASE ............................................................................... 2

    *1.*   *Statutory Background* ........................................................................ 2

    *2.*   *Procedural History* ............................................................................ 4

SUMMARY OF ARGUMENT .............................................................................. 6

ARGUMENT

    I    PRIVATE PLAINTIFFS HAVE A RIGHT OF ACTION TO
       ENFORCE THE MATERIALITY PROVISION ............................... 7

        *A.*   *Plaintiffs Can Enforce The Materiality Provision Under*
            *42 U.S.C. 1983* ........................................................................... 8

        *B.*   *The Materiality Provision Contains An Implied Private*
            *Right of Action* ........................................................................ 14

    II   THIS COURT SHOULD REJECT RITTER'S ATTEMPT TO
        RESTRICT THE MATERIALITY PROVISION'S REACH ........... 21

        *A.*   *The Materiality Provision Is Not Limited To Racially*
            *Discriminatory Actions* ........................................................... 22

        *B.*   *The Materiality Provision Is Not Limited To Voter*
            *Registration Documents* .......................................................... 25

CONCLUSION ...................................................................................................... 30

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                                **PAGE**

*Alexander* v. *Sandoval*, 532 U.S. 275 (2001) .................................................. *passim*

*Ali* v. *Federal Bureau of Prisons*, 552 U.S. 214 (2008) ................................... 25, 28

*Allen* v. *State Bd. of Elections*, 393 U.S. 544 (1969)....................................... 19, 21

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) .................................................. 9, 11, 13

*Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731 (2020)....................................................24

*Christopher* v. *SmithKline Beecham Corp.*, 567 U.S. 142 (2012) .........................29

*Colon-Marrero* v. *Velez*, 813 F.3d 1 (1st Cir. 2016) ...........................................7, 13

*Crawford* v. *Marion Cnty. Election Bd.*, 553 U.S. 181 (2008)...............................23

*Facebook, Inc.* v. *Duguid*, 141 S. Ct. 1163 (2021)..................................................27

*FCC* v. *NextWave Pers. Commc'ns Inc.*, 537 U.S. 293 (2003)...............................23

*Fitzgerald* v. *Barnstable Sch. Comm.*, 555 U.S. 246 (2009) ..................................13

*Florida State Conf. of NAACP* v. *Browning*, 522 F.3d 1153 (11th Cir. 2008) .......25

*Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230 (2009) .............................................16

*Gonzaga Univ.* v. *Doe*, 536 U.S. 273 (2002).................................................. 8, 10-12

*Grammer* v. *John J. Kane Reg'l Centers-Glen Hazel*,
    570 F.3d 520 (3d Cir. 2009), cert. denied, 559 U.S. 939 (2010) ............ 10-13

*Harrison* v. *PPG Indus., Inc.*, 446 U.S. 578 (1980) ................................................27

*Intel Corp.* v. *Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).......................24

*Intel Corp. Inv. Pol'y Comm.* v. *Sulyma*, 140 S. Ct. 768 (2020) ............................23

**CASES (continued):** **PAGE**

*Lawson* v. *FMR LLC*, 571 U.S. 429 (2014)............................................................24

*League of Women Voters of Ark.* v. *Thurston*, No. 5:20-CV-05174,
2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) ............................................26

*Lewis* v. *Alexander*, 685 F.3d 325 (3d Cir. 2012),
cert. denied, 568 U.S. 1123 (2013)............................................................ 9-10

*Loughrin* v. *United States*, 573 U.S. 351 (2014) ....................................................29

*Martin* v. *Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) ........................ 26, 29

*McKay* v. *Thompson*, 226 F.3d 752 (6th Cir. 2000),
cert. denied, 532 U.S. 906 (2001)....................................................................9

*Morse* v. *Republican Party of Va.*, 517 U.S. 186 (1996)............................ 15, 19-21

*NLRB* v. *SW Gen., Inc.*, 137 S. Ct. 929 (2017)........................................................24

*Northeast Ohio Coal. for the Homeless* v. *Husted*,
837 F.3d 612 (6th Cir. 2016), cert. denied, 137 S. Ct. 2265 (2017) ..............9

*Organization for Black Struggle* v. *Ashcroft*,
493 F. Supp. 3d 790 (W.D. Mo. 2020)...........................................................26

*Sabree ex rel. Sabree* v. *Richman*, 367 F.3d 180 (3d Cir. 2004).......................9, 11

*Schwier* v. *Cox*, 340 F.3d 1284 (11th Cir. 2003) ............................................ *passim*

*Smith* v. *Allwright*, 321 U.S. 649 (1944) ......................................................... 15-16

*Verizon Md., Inc.* v. *Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002)...............15

*Wisniewski* v. *Rodale, Inc.*, 510 F.3d 294 (3d Cir. 2007),
cert. denied, 555 U.S. 814 (2008)................................................ 10, 16-17, 19

**STATUTES:**  **PAGE**

Voting Rights Act of 1965
    52 U.S.C. 10304(a) ...................................................................20
    52 U.S.C. 10306(a) ...................................................................20
    52 U.S.C. 10306(b) ...................................................................20
    52 U.S.C. 10306(c) ...................................................................20

42 U.S.C. 1971 .............................................................................2

42 U.S.C. 1983 ...................................................................... *passim*

52 U.S.C. 10101
    52 U.S.C. 10101(a) ...................................................................23
    52 U.S.C. 10101(a)(1) ......................................................... 11, 23
    52 U.S.C. 10101(a)(2)(A) ..........................................................11
    52 U.S.C. 10101(a)(2)(B) .................................................... *passim*
    52 U.S.C. 10101(a)(2)(C) ..........................................................11
    52 U.S.C. 10101(a)(3) .................................................................3
    52 U.S.C. 10101(b) ...................................................................11
    52 U.S.C. 10101(c) ........................................................... 1, 13, 15
    52 U.S.C. 10101(d) ............................................................. 14, 17
    52 U.S.C. 10101(e) ......................................................... 3, 17, 26
    52 U.S.C. 10101(g) ..............................................................3, 18

Civil Rights Act of 1957,
    Pub. L. No. 85-315, § 131(c), 71 Stat. 637-638 .............................3

Civil Rights Act of 1964,
    Pub. L. No. 88-352, § 101, 78 Stat. 241-242 .................................3

Enforcement Act of 1870
    Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140 ..................... 15, 23

**RULE:**

Fed. R. App. P. 29(a) ....................................................................2

**LEGISLATIVE HISTORY:**                                    **PAGE**

H.R. Rep. No. 291, 85th Cong., 1st Sess. (1957) .................................... 3, 16, 18-19

H.R. Rep. No. 914, 88th Cong., 1st Sess. (1963) ................................................3, 12

**MISCELLANEOUS:**

*Webster's New International Dictionary of the English Language*
    (2d ed. unabridged 1960)................................................................................26

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 22-1499

LINDA MIGLIORI, *et al.*,

Plaintiffs-Appellants

v.

LEHIGH COUNTY BOARD OF ELECTIONS, *et al.*,

Defendants-Appellees

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS-APPELLANTS AND SUPPORTING REVERSAL

———————————

**INTEREST OF THE UNITED STATES**

This case involves the Materiality Provision of the Civil Rights Act of 1964,

52 U.S.C. 10101(a)(2)(B).  The United States, through the Attorney General, has a

direct role in enforcing the Provision.  52 U.S.C. 10101(c).  Accordingly, the

United States has a significant interest in the proper interpretation of the Provision,

including whether private plaintiffs also can enforce it.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUES

1.  Whether private plaintiffs have a right of action, either under 42 U.S.C. 1983 or implied from the statute itself, to enforce the Materiality Provision.

2.  Whether the Materiality Provision applies to actions not motivated by racial discrimination and to errors or omissions not involving voter registration records.[1]

## STATEMENT OF THE CASE

*1.   Statutory Background*

What is now 52 U.S.C. 10101 traces its lineage to the Enforcement Act of 1870.  There, the Reconstruction Congress provided that any person otherwise qualified to vote "shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State  *  *  *  to the contrary notwithstanding." Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140 (codified as amended at 52 U.S.C. 10101(a)(1)).  Until 1957, private parties alone had the power to enforce this law, by then codified at 42 U.S.C. 1971—typically via suits brought under 42 U.S.C.

---

[1]  The United States takes no position at this time on any other issue presented in this case.

- 3 -

1983.  See H.R. Rep. No. 291, 85th Cong., 1st Sess. 12 (1957) (1957 House

Report); *Schwier* v. *Cox*, 340 F.3d 1284, 1295 (11th Cir. 2003) (citing cases).

The Civil Rights Act of 1957 added four subsections to Section 1971 and,

for the first time, provided the Attorney General with power to enforce the statute

through civil suits.  Pub. L. No. 85-315, § 131(c), 71 Stat. 637-638 (codified as

amended at 52 U.S.C. 10101(b)-(d) and (g)).

In 1964, Congress again amended Section 1971 to "provide specific

protections to the right to vote."  H.R. Rep. No. 914, 88th Cong., 1st Sess. 19

(1963) (1963 House Report); see Civil Rights Act of 1964, Pub. L. No. 88-352,

§ 101, 78 Stat. 241-242.  Among the amendments is the Materiality Provision,

which today states:

> No person acting under color of state law shall  *  *  *  deny the right
> of any individual to vote in any election because of an error or
> omission on any record or paper relating to any application,
> registration, or other act requisite to voting, if such error or omission
> is not material in determining whether such individual is qualified
> under State law to vote in such election.

52 U.S.C. 10101(a)(2)(B).  The statute defines "vote" to "include[] all action

necessary to make a vote effective including, but not limited to, registration or

other action required by State law prerequisite to voting, casting a ballot, and

having such ballot counted and included in the appropriate totals of votes cast."  52

U.S.C. 10101(a)(3)(A) and (e).

2.    *Procedural History*

a.  Pennsylvania law allows any voter to request a mail-in ballot.  JA8.[2]

Once officials verify the requester's eligibility to vote, they send the voter a

package including a ballot, a secrecy envelope in which to place it, and a return

envelope in which to place the secrecy envelope.  JA8-9.  Voters must "fill out,

date and sign the declaration" printed on the return envelope before returning their

ballots.  JA9 (citation omitted).

Lehigh County held an election on November 2, 2021, to fill three vacant

positions on its Court of Common Pleas.  JA9.  David Ritter, the third-place

finisher, currently leads fourth-place candidate Zachary Cohen by 74 votes.  JA9.

However, election officials set aside 257 timely-returned mail-in ballots for failure

to meet the State's mandate to date the oath on their return envelopes (the dating

requirement).  JA9-10.

After a public hearing, the Lehigh County Board of Elections (the Board)

unanimously voted to count the disputed ballots.  JA10.  In a suit filed by Ritter,

however, the Commonwealth Court of Pennsylvania held that ballots not meeting

the dating requirement cannot be counted.  JA10.  On remand, the Court of

Common Pleas ordered the Board not to count ballots with undated envelopes.

JA10.

---

[2]  "JA_" indicates the page number of the Joint Appendix.

b.  Plaintiffs are five of the voters whose ballots the Board has not counted. JA6.  Four days after the state trial court order issued, plaintiffs sued the Board in federal district court.  JA10.  As relevant here, they asserted a claim under 42 U.S.C. 1983 (JA52), alleging that the Board's failure to count their ballots violates rights secured by the Materiality Provision.  JA7.  Ritter and Cohen both intervened in the action, and the parties cross-moved for summary judgment.  JA7.

c.  On March 16, 2022, the district court granted the Board's and Ritter's (collectively, defendants') summary judgment motions.  JA7.  The court agreed with defendants that plaintiffs lacked a cause of action to enforce the Materiality Provision.  JA23-30.  The court found that "§ 10101 provides a personal right to Plaintiffs."  JA24.  But it determined that Congress did not intend to create a private remedy for violation of the Provision, principally because Section 10101 authorizes enforcement by the United States.  JA24-30.  The court did not discuss plaintiffs' argument that they could assert a claim under Section 1983 for a violation of the Provision.[3]

d.  Plaintiffs appealed.  JA1-3.  This Court temporarily enjoined certification of the election and set an expedited briefing schedule.

---

[3]  The court also ruled for defendants on plaintiffs' fundamental right-to-vote claim.  JA30-33.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's grant of summary judgment on plaintiffs' claim under the Materiality Provision, 52 U.S.C. 10101(a)(2)(B).

The district court erred in concluding that plaintiffs lack a cause of action for violations of the Materiality Provision.  The court recognized that the Provision creates a personal right to vote for individual voters who are qualified under state law, regardless of immaterial errors or omissions in their voting records or papers.  But the court assumed that private plaintiffs may enforce that right only if Section 10101 creates an implied private right of action.  That is wrong: 42 U.S.C. 1983 supplies a general private remedy for violations of federal rights.  Accordingly, if a statute confers an individual right, that right is presumptively enforceable via Section 1983.  Defendants have not rebutted that presumption here.  Section 1983 thus provides an express cause of action for violations of the Materiality Provision.  Therefore, the Court need not reach the question whether the Provision itself creates an implied private right of action.  Nevertheless, the Provision's statutory text, context, and history, and the Supreme Court's treatment of similar provisions in the Voting Rights Act, all indicate that the Provision itself contains an implied private right of action.

This Court also should reject Ritter's alternative arguments about the Provision's substantive scope, which contradict the statutory text.  Contrary to his

assertions, the Provision is not limited to racially discriminatory state regulations. In contrast to other subsections of Section 10101, the Provision's text says nothing about race and contains no other textual indication of such a limitation.  While Congress's primary concern in 1964 may have involved racial discrimination, the text it enacted is not limited to such discrimination.  And the Provision extends beyond voter registration documents.  Its plain text applies to any "other act requisite to voting"—including, as relevant here, the dating of an oath on an absentee ballot envelope.  52 U.S.C. 10101(a)(2)(B).

## ARGUMENT

## I

## PRIVATE PLAINTIFFS HAVE A RIGHT OF ACTION TO ENFORCE THE MATERIALITY PROVISION

The district court dismissed plaintiffs' Materiality Provision claim because it found that the provision did not create its own private right of action.  But the court both applied the incorrect doctrinal framework and reached the wrong conclusion even under the framework it applied.

Plaintiffs "seeking to enforce their rights under [a statutory] provision" lacking an express cause of action can proceed on "two different paths":  (1) under 42 U.S.C. 1983, when suing defendants who acted under color of law, or (2) through a right of action implied from the substantive statute itself.  *Colon-Marrero* v. *Velez*, 813 F.3d 1, 15 (1st Cir. 2016).  Under either inquiry, courts

"must first determine whether Congress *intended to create a federal right*."

*Gonzaga Univ.* v. *Doe*, 536 U.S. 273, 283 (2002).  The two paths diverge,

however, at the second step in the analysis.  "Plaintiffs suing under § 1983 do not

have the burden of showing an intent to create a private remedy because § 1983

generally supplies a remedy for the vindication of rights secured by federal

statutes."  *Id.* at 284.  By contrast, "a plaintiff suing under an implied right of

action still must show that the statute manifests an intent 'to create not just a

private *right* but also a private *remedy.*'"  *Ibid.* (quoting *Alexander* v. *Sandoval*,

532 U.S. 275, 286 (2001)).  Individual voters, like plaintiffs here, have a right of

action to enforce the Materiality Provision under both theories.

A.    *Plaintiffs Can Enforce The Materiality Provision Under 42 U.S.C. 1983*

       In their summary judgment briefing, plaintiffs correctly stated the standards

for finding a right enforceable under Section 1983, and argued that defendants had

failed to rebut the presumption that they could enforce the Materiality Provision

under that statute.  JA752-754.  Yet the district court ignored these arguments,

focusing only on the standards for implying a right of action from the Provision

itself.  JA15-16, 23-30.  Under the correct framework, it is plain that private

- 9 -

plaintiffs may sue under Section 1983.  This Court should join the Eleventh Circuit

in so holding.  See *Schwier* v. *Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003).[4]

1.  The district court correctly concluded that "§ 10101 provides a personal

right to Plaintiffs."  JA24.  To determine whether statutory text contains "rights-

creating language," *Sabree ex rel. Sabree* v. *Richman*, 367 F.3d 180, 187 (3d Cir.

2004), this Court relies on the three-factor test articulated in *Blessing* v. *Freestone*,

520 U.S. 329, 340-341 (1997):  "(1) the statutory provision must benefit the

plaintiffs with a right unambiguously conferred by Congress; (2) the right cannot

be so 'vague and amorphous' that its enforcement would strain judicial

competence; and (3) the statute must impose a binding obligation on the States."

*Lewis* v. *Alexander*, 685 F.3d 325, 344 (3d Cir. 2012), cert. denied, 568 U.S. 1123

(2013).  The Materiality Provision meets these standards.

First, the Provision unambiguously confers a personal right.  *Lewis*, 685

F.3d at 344.  It prohibits state actors from denying "the right of any individual to

vote" on specified grounds.  52 U.S.C. 10101(a)(2)(B).  The provision is "phrased

in terms of the persons benefitted, not in terms of a general 'policy or practice.'"

---

[4]  The only other circuit to address this issue never discussed Section 1983, merely stating that the Materiality Provision "is enforceable by the Attorney General, not by private citizens."  *McKay* v. *Thompson*, 226 F.3d 752, 756 (6th Cir. 2000), cert. denied, 532 U.S. 906 (2001); see *Northeast Ohio Coal. for the Homeless* v. *Husted*, 837 F.3d 612, 630 (6th Cir. 2016) (acknowledging arguments for finding right of action but holding that *McKay* "binds this panel"), cert. denied, 137 S. Ct. 2265 (2017).

*Grammer* v. *John J. Kane Reg'l Centers-Glen Hazel*, 570 F.3d 520, 528 (3d Cir. 2009) (quoting *Gonzaga*, 536 U.S. at 287), cert. denied, 559 U.S. 939 (2010). "With an explicit reference to a right and a focus on the individual protected, this language suffices to demonstrate Congress's intent to create a personal right." *Wisniewski* v. *Rodale, Inc.*, 510 F.3d 294, 302 (3d Cir. 2007), cert. denied, 555 U.S. 814 (2008).

The Materiality Provision is framed as an active-voiced prohibition on "person[s] acting under color of law," rather than as a passive-voiced statement about what rights voters cannot be denied.  52 U.S.C. 10101(a)(2)(B); see JA803-804.  But this Court "do[es] not consider Congress's use of the passive voice a reliable guide to its intent to create personal rights."  *Wisniewski*, 510 F.3d at 302 n.19.  After all, "[t]he apparent 'focus' of a statute might have more to do with Congress's writing style than its intent."  *Ibid.*  Thus, statutes directed at a regulated party can still create rights when their "plain purpose  *  *  *  is to protect rights afforded to individuals."  *Grammer*, 570 F.3d at 530; see *Lewis*, 685 F.3d at 344; *Wisniewski*, 510 F.3d at 302 n.19.  As the Eleventh Circuit found when examining the Materiality Provision:  "The subject of the sentence is the person acting under color of state law, but the focus of the text is nonetheless the protection of each individual's right to vote."  *Schwier*, 340 F.3d at 1296.

- 11 -

The other *Blessing* factors also are easily satisfied. "[T]he statute clearly provides rights which are specific and not amorphous." *Schwier*, 340 F.3d at 1296. Qualified voters must be allowed to vote regardless of immaterial errors in a record or paper requisite to voting. This right is "clearly delineated by the provision[] at issue." *Grammer*, 570 F.3d at 528. And the Materiality Provision creates an absolute prohibition: "No person acting under color of law" can "deny the right of any individual to vote" on the specified grounds. 52 U.S.C. 10101(a)(2)(B). The statute is thus "couched in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. at 341; see *Schwier*, 340 F.3d at 1297. And the plaintiffs here do not merely "fall[] within the general zone of interest that the statute is intended to protect." *Sabree*, 367 F.3d at 189 (quoting *Gonzaga*, 536 U.S. at 283). They are its sole and express focus.

Finally, the statute's structure and legislative history confirm Congress's intent to create a personal right. Section 10101 contains no "countervailing structural elements" to suggest a programmatic rather than an individual focus. *Sabree*, 367 F.3d at 192. To the contrary, its other substantive provisions are likewise focused on individual voters' right to vote free of irrational barriers, discrimination, or intimidation. See 52 U.S.C. 10101(a)(1), (a)(2)(A), (a)(2)(C), and (b).

- 12 -

The House report on the Materiality Provision "is likewise compelling" on this score. *Grammer*, 570 F.3d at 530.  Congress amended Section 10101 to better fulfill the "guarantee to all citizens [of] the right to vote without discrimination." 1963 House Report 19.  The new provisions, including the Materiality Provision, were designed to "reduce discriminatory obstacles to the exercise of the right to vote and provide means of expediting the vindication of that right."  1963 House Report 18.  Like the statutory text, this legislative history indicates Congress's focus on ensuring that individuals are "accorded the rights, privileges, and opportunities which are considered to be, and must be, the birthright of all citizens." *Ibid.*

2.  Because plaintiffs relied on 42 U.S.C. 1983 for their cause of action (JA41 ¶ 5; JA52), the district court erred in focusing on whether the Materiality Provision itself creates a private remedy.  In cases like this one, "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284.  The district court thus was required to determine not whether plaintiffs had shown that the Materiality Provision creates a private remedy, but rather whether defendants could "rebut the presumption of an enforceable right under § 1983." *Grammer*, 570 F.3d at 532.[5]

---

[5]  The district court's off-base criticisms of *Schwier* (JA28-30) stem from its failure to recognize that the Eleventh Circuit's decision relied on Section 1983. *Schwier*, 340 F.3d at 1294-1297; see Pls.' Br. 38-39.

- 13 -

Defendants have not met their burden.  They have not even attempted to show that Section 10101 "contains express terms" denying plaintiffs a Section 1983 remedy.  *Grammer*, 570 F.3d at 532.  Nor could they, because no such terms exist.  Likewise, defendants have not "ma[d]e the difficult showing" that the statute contains a "carefully tailored scheme" inconsistent with Section 1983 remedies.  *Blessing*, 520 U.S. at 346 (citation omitted).

Instead, defendants have argued (JA498-501; JA612-617) that somehow the inclusion of a right of action for the United States, see 52 U.S.C. 10101(c), precludes a right of action for private plaintiffs.  Not so.  See *Schwier*, 340 F.3d at 1296.  As the Supreme Court has explained, the existence of a public remedy cannot rebut the presumption in favor of applying Section 1983.  Rather, it is "the existence of a more restrictive *private* remedy for statutory violations" that draws "the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not."  *Fitzgerald* v. *Barnstable Sch. Comm.*, 555 U.S. 246, 256 (2009) (emphasis added; citation omitted); see *Colon-Marrero*, 813 F.3d at 21-22 (finding plaintiffs may enforce Help America Vote Act via Section 1983, even though "[t]he Attorney General may bring a civil action").  Section 10101 "contains no express private remedy, much less a more restrictive one."  *Fitzgerald*, 555 U.S. at 256; see also pp. 16-21, *infra* (explaining why Attorney General's enforcement authority does not displace

the private right of action).  Plaintiffs therefore may sue under Section 1983.  If the Court so finds, then it should reverse on this basis and vacate the district court's implied-right-of-action holding.

B.    *The Materiality Provision Contains An Implied Private Right Of Action*

As explained, this Court need not consider the district court's implied-right-of-action holding because the district court improperly ignored plaintiffs' Section 1983 right of action.  However, plaintiffs would have a right of action even if they had sued under the Materiality Provision itself.

Start "with the text and structure of" Section 10101.  *Sandoval*, 532 U.S. at 288.  As already explained, and as the district court acknowledged, the Materiality Provision indicates a strong intent to create—and protect—a personal federal right.  See pp. 9-12, *supra*.

The statutory context also "manifest[s] an intent to create a private remedy," *Sandoval*, 532 U.S. at 289, to vindicate this fundamental individual right.  Most prominently, Section 10101(d) provides district courts with "jurisdiction of proceedings instituted pursuant to this section" and states that they "shall exercise the same without regard to whether *the party aggrieved* shall have exhausted any administrative or other remedies that may be provided by law."  52 U.S.C. 10101(d) (emphasis added).  The subsection's reference to "the party aggrieved"— the individual who has been denied the right to vote—rather than only to "the

- 15 -

United States" clearly contemplates private enforcement. See, *e.g.*, *Verizon Md., Inc.* v. *Public Serv. Comm'n of Md.*, 535 U.S. 635, 644 (2002) (stating that provision allowing "[a]ny party aggrieved" to "bring an action" "reads like the conferral of a private right of action" (citation omitted)); *Morse* v. *Republican Party of Va.*, 517 U.S. 186, 233 (1996) (opinion of Stevens, J.) (finding support for private right of action in a procedural provision amended "to cover actions brought by 'the Attorney General *or an aggrieved person*'" (citation omitted)). The language releasing plaintiffs from exhaustion requirements likewise indicates that Congress intended to authorize private enforcement, as the Attorney General is not subject to such requirements. See *Schwier*, 340 F.3d at 1296; see also 52 U.S.C. 10101(c) (authorizing suits by the Attorney General without imposing any exhaustion requirement); cf. *Morse*, 517 U.S. at 234 (opinion of Stevens, J.) (relying on inclusion of attorney's fees provision to imply right of action since "the Attorney General does not collect attorney's fees").

What text suggests, history confirms. The original substantive provision of the statute, Section 10101(a)(1), contained no express enforcement provision. See Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140. And yet for three-quarters of a century, until Congress added enforcement authority for the United States in 1957, private parties were the *only* plaintiffs who could enforce Section 10101. *Schwier*, 340 F.3d at 1295; see, *e.g.*, *Smith* v. *Allwright*, 321 U.S. 649, 652 & n.1 (1944)

(deciding private suit under statute).  Congress cited this history of private

enforcement approvingly when it added the Attorney General suit provision,

Section 10101(c).  1957 House Report 12.  Given Congress's awareness of the

history of private enforcement, the current version of the statute "cannot be read

except as a validation of" private enforcement of Section 10101.  *Sandoval*, 532

U.S. at 280 (citation omitted) (discussing Title VI); see *Forest Grove Sch. Dist.* v.

*T.A.*, 557 U.S. 230, 239-240 (2009) ("Congress is presumed" to adopt preexisting

judicial interpretation "when it re-enacts a statute without change" to interpreted

text. (citation omitted)).

The district court nevertheless found, based on this Court's decision in

*Wisniewski* v. *Rodale, Inc.*, 510 F.3d 294, that Section 10101's Attorney General

enforcement provision precludes a private remedy.  JA23-30.  Relying on

*Sandoval*'s statement that "[t]he express provision of one method of enforcing a

substantive rule suggests that Congress intended to preclude others," the

*Wisniewski* Court suggested that "agency enforcement creates a strong

presumption against implied private rights of action that must be overcome" by

other evidence.  510 F.3d at 305.  But neither *Sandoval* nor *Wisniewski* suggests

that adding a provision for civil suits by the Attorney General can, by itself,

preclude parallel private suits, especially ones that were previously authorized.

Each case *Sandoval* cites for its preclusion principle—like *Sandoval* itself—

involved statutes that authorized either a combination of judicial and administrative enforcement schemes or the sort of express, restrictive private rights of action that preclude broader remedies even under Section 1983.  See 532 U.S. at 290 (citing cases).  *Wisniewski*, similarly, involved a Federal Trade Commission enforcement scheme that included detailed internal administrative proceedings as well as the power to bring civil suits.  See 510 F.3d at 304 & nn.28-30 (outlining remedies available under 15 U.S.C. 45).

Even if *Wisniewski*'s "strong presumption" were to apply here, overwhelming evidence would "overcome" it.  510 F.3d at 305.  First, again, is the text.  See pp. 9-12, *supra* (discussing the rights-creating language that is a principal signal "of congressional intent to create a private right of action," *Sandoval*, 532 U.S. at 290 (citation omitted)); pp. 14-15, *supra* (discussing 52 U.S.C. 10101(d)).

When Congress desired to make Section 10101's enforcement procedures exclusive to federal-government suits, it said so.  For instance, the statute creates a suite of special remedies in cases where a court finds a "a pattern or practice" of racial discrimination, 52 U.S.C. 10101(e), but applies these remedies only in cases "instituted pursuant to subsection (c)"—the subsection that authorizes enforcement by the Attorney General, *ibid.*  Similarly, the statute allows the Attorney General to seek a three-judge court "[i]n any proceeding *instituted by the United States*" where the Attorney General seeks "a finding of a pattern or practice of

discrimination." 52 U.S.C. 10101(g) (emphasis added).  Congress would have had no need to name "the United States" or "the Attorney General" in these provisions, or to limit them to cases "brought under subsection (c)," if the Attorney General were the sole possible plaintiff in all Section 10101 cases.

Statutory and legislative history also indicate that Congress did not intend to make the Attorney General's enforcement exclusive.  Congress passed the Civil Rights Act of 1957 "to provide means of *further* securing and protecting the civil rights of persons."  1957 House Report 1 (emphasis added).  It included enforcement power for the Attorney General "to *strengthen* and *protect* the right to vote," as part of Congress's effort to "preserve this fundamental and basic right against any and all unlawful interference."  1957 House Report 3, 13 (emphases added).  "[I]t is highly unlikely that in 'enacting civil rights legislation for the first time since the Reconstruction era [Congress] would simultaneously withdraw existing protection' from § 1971."  *Schwier*, 340 F.3d at 1295.  Indeed, the House report recognized Section 10101's long history of private enforcement, yet said nothing about supplanting private suits.  1957 House Report 12.

To the contrary, Congress affirmatively acted to *prevent* such a scheme.  It eliminated a provision from a prior version of the bill that would have authorized the Attorney General to sue "in the name of the United States *but for the benefit of the real party in interest* to recover damages as well as other preventive relief."

1957 House Report 4 (emphasis added).  Congress chose instead to limit the Attorney General to injunctive suits "for or in the name of the United States."  *Ibid.*

This history echoes the Department of Justice's rationale for seeking enforcement authority.  At the time, it only had authority to bring criminal voting-rights cases, but believed that civil cases "may often be far more effective" in forestalling voting-rights violations.  1957 House Report 15.  Thus, the new Section 1971(c), now Section 10101(c), "merely substitute[d] civil proceedings for criminal proceedings in the already established field."  *Id.* at 6.

Finally, precedent weighs in favor of a right of action.  As *Wisniewski* acknowledged, the Supreme Court has found implied private rights of action in "anti-discrimination statutes"—even those "that expressly provide for agency or other enforcement"—where there is "longstanding precedent interpreting the same or similar language to create a private right of action."  510 F.3d at 305 n.31.  The Supreme Court already has found that Sections 5 and 10 of the Voting Rights Act (VRA) contain implied private rights of action, even though both contain express rights of action for the Attorney General but none for private parties.  *Morse*, 517 U.S. at 230-235 (opinion of Stevens, J.) (Section 10); *id.* at 240 (Breyer, J., concurring in the judgment); *Allen* v. *State Bd. of Elections*, 393 U.S. 544, 554-557 (1969) (Section 5); see *Schwier*, 340 F.3d at 1294-1295.

Those provisions share structures similar to Section 10101's. VRA Section 10, like the Materiality Provision, declares voters' right to vote despite failure to meet certain state requirements—in Section 10's case, payment of a poll tax. 52 U.S.C. 10306(a). It then similarly grants the Attorney General authority to sue for violations and to institute three-judge courts. 52 U.S.C. 10306(b) and (c). VRA Section 5, meanwhile, prohibits states from "deny[ing]" voters "the right to vote for failure to comply with" certain laws. 52 U.S.C. 10304(a). It then creates an even more detailed procedure for adjudicating violations, including an administrative review regime. *Ibid.* Given these textual and structural similarities to the Materiality Provision, the Supreme Court's holdings in *Allen* and *Morse* confirm that a private right of action should exist here as well.

Two additional aspects of the *Allen* and *Morse* decisions support a right of action here. First, the Court emphasized that Congress passed the VRA "against a 'backdrop' of decisions in which implied causes of action were regularly found." *Morse*, 517 U.S. at 231 (opinion of Stevens, J.) (citation omitted); see *id.* at 240 (Breyer, J., concurring in the judgment) (agreeing with Justice Stevens's reasoning). Congress passed the Materiality Provision only a year earlier, against the same legal backdrop. While it can no longer be considered a "dispositive" factor, this "legal context matters" because it "buttresse[s] a conclusion independently supported by the text of the statute." *Sandoval*, 532 U.S. at 288.

Second, in both cases the Court "attached significance to the fact that the Attorney General had urged [it] to find that private litigants may enforce the Act." *Morse*, 517 U.S. at 231 (opinion of Stevens, J.); see *id.* at 240 (Breyer, J., concurring in the judgment) (applying "the rationale of *Allen*"); *Allen*, 393 U.S. at 557 n.23.  The United States takes the same position here.

For all of these reasons, Congress's decision to supplement private suits under Section 10101 with federal enforcement did not preclude a private remedy. This implied right of action exists alongside the Section 1983 remedy, not in place of it.

## II

## THIS COURT SHOULD REJECT RITTER'S ATTEMPT TO RESTRICT THE MATERIALITY PROVISION'S REACH

This Court should reject the arguments Ritter made, both in the summary judgment briefing below and in his emergency injunction response brief, regarding the scope of the Materiality Provision.  First, Ritter argues that the Provision covers only laws that discriminate based on race.  See JA617-619; Ritter Resp. 10-12.[6]  Second, Ritter argues that the Provision applies only to voter registration. See JA619-620; Ritter Resp. 13-14.  He is twice wrong.  Unlike the original

---

[6] "__ Resp. __" indicates the page number of the named defendant's response in opposition to plaintiffs' emergency motion for injunction pending appeal.

- 22 -

provision of Section 10101 enacted in 1870, the Materiality Provision reaches

beyond racially discriminatory laws.  And the provision covers errors or omissions,

not merely in "any application" or "registration," but also in any "other act

requisite to voting," which includes the filling out of information on absentee

ballot envelopes.

A.     *The Materiality Provision Is Not Limited To Racially Discriminatory
       Actions*

Ritter has argued (Resp. 10-12)—as has the Board (Resp. 9), in passing—

that the Materiality Provision is limited to racially discriminatory laws.  Even the

barest look at the statutory language refutes this claim.  The Provision prohibits

any "person acting under color of state law" from "deny[ing] the right of any

individual to vote in any election because of an error or omission on any record or

paper relating to any application, registration, or other act requisite to voting," as

long as the error or omission is "not material in determining whether such

individual is qualified under State law to vote in such election."  52 U.S.C.

10101(a)(2)(B).  Nowhere does this text so much as mention race, much less

suggest that racial discrimination is required to trigger its application.  Rather, it

provides a broader limitation on state or local actions that deny the right to vote

based on irrelevant errors or omissions.  It thereby effectuates a different

principle—one that the Supreme Court has articulated in the constitutional realm:

that "even rational restrictions on the right to vote are invidious" if they are

- 23 -

"irrelevant to the voter's qualifications." *Crawford* v. *Marion Cnty. Election Bd.*, 553 U.S. 181, 189 (2008) (opinion of Stevens, J.).

Statutory context buttresses this plain-text reading. A neighboring provision, 52 U.S.C. 10101(a)(1), *does* mention race, mandating that otherwise qualified voters "shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude." Courts "generally presume that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another." *Intel Corp. Inv. Pol'y Comm.* v. *Sulyma*, 140 S. Ct. 768, 777 (2020) (citation and alteration omitted).

Indeed, Section 10101(a)(1) already covers the waterfront of direct racial discrimination in voting; restricting the Materiality Provision to discriminatory laws would thus render the Provision superfluous. This Court should reject that reading, because a ban on racial discrimination in voting "is already explicitly achieved by *another* portion of" the same statute. *FCC* v. *NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 307 (2003).

Ritter's focus on Section 10101(a)'s title (Resp. 10-11) is similarly misplaced. True, the title contains the words "Race, color, or previous condition not to affect right to vote." 52 U.S.C. 10101(a). But that language corresponds to Section 10101*(a)(1)*, which was originally enacted in the Enforcement Act of 1870. Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140. That Act included the same

- 24 -

shorthand title on which Ritter relies.  See *ibid.* (margin).  A *different* portion of Section 10101(a)'s title—"errors or omissions from papers"—describes the Materiality Provision.  Tellingly, that portion is the third phrase in the title, and the Materiality Provision is the third prohibition in Section 10101.  See 52 U.S.C. 10101(a)(2)(B).  Regardless, statutory headings "are 'but a short-hand reference to the general subject matter' of the provision, 'not meant to take the place of the detailed provisions of the text.'"  *Lawson* v. *FMR LLC*, 571 U.S. 429, 446 (2014) (citation omitted).  Thus, "[t]he caption of a statute  *  *  *  'cannot undo or limit that which the statute's text makes plain.'"  *Intel Corp.* v. *Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) (citation omitted).

Nor can defendants rely on vague notions of congressional intent.  They assert that the Civil Rights Act of 1964 was passed to prevent racial discrimination in the voting process and that the Materiality Provision therefore must be similarly limited.  Lehigh Resp. 9; Ritter Resp. 11; JA617-618.  This argument is irrelevant.  When "[t]he text is clear," as it is here, courts do not consider "extra-textual evidence" of purpose.  *NLRB* v. *SW Gen., Inc.*, 137 S. Ct. 929, 942 (2017).  In any case, Congress often enacts text that "reaches 'beyond the principal evil' legislators may have intended or expected to address."  *Bostock* v. *Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020) (citation omitted).  Indeed, the very case Ritter cites (JA617-618; Resp. 11) for his purpose argument found that the Materiality

Provision sweeps beyond "the historically motivating examples of intentional and overt racial discrimination." *Florida State Conf. of NAACP* v. *Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008); see also Pls.' Br. 50 (citing additional cases).[7]

B.     *The Materiality Provision Is Not Limited To Voter Registration Documents*

For similar reasons, Ritter errs in claiming that the Materiality Provision extends only to voter registration materials.  Again, the plain text refutes this argument.  The Provision applies to "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting."  52 U.S.C. 10101(a)(2)(B).

Start with the word "any," repeated twice in the Provision.  The Provision uses the word "any" both when referring to "record[s] or paper[s]" and when referring to what those records or papers "relat[e] to."  The first use requires a "broad" reading reaching documents "of whatever kind.'"  *Ali* v. *Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008) (citation omitted).  The second use requires a similarly "broad" reading of the occasions on which an immaterial error might occur, *ibid.*:  during the processes of applying, registering, or undertaking whatever kind of act is "requisite to voting."

---

[7]  The Materiality Provision's text, which says nothing about discrimination of any sort and applies to "any individual," 52 U.S.C. 10101(a)(2)(B), also refutes Ritter's (Resp. 11) slightly less constricted argument that "an allegation of discrimination—whether based on race or otherwise—is a prerequisite to applying Section 101."

To limit the "other act[s]" covered to "voter registration laws," and the "paper[s]" covered to voter registration materials, would ignore this indicator. Resp. 13. Voter registration materials are already covered by the statutory phrase "record or paper relating to any * * * registration." 52 U.S.C. 10101(a)(2)(B). But the Materiality Provision's text extends beyond that subset of materials. That is why several courts have recently applied the Provision to, among other things, absentee ballot applications, *League of Women Voters of Ark.* v. *Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021); *Organization for Black Struggle* v. *Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020), and a "year of birth" requirement on "absentee ballot envelope[s]," *Martin* v. *Crittenden*, 347 F. Supp. 3d 1302, 1308-1309 (N.D. Ga. 2018).

The statutory definition of "vote" also undercuts Ritter's argument. The Materiality Provision applies to "any * * * other act requisite to voting." 52 U.S.C. 10101(a)(2)(B). "Requisite" means "[r]equired by the nature of things, by circumstances, or by the end in view; necessary." *Webster's New International Dictionary of the English Language* 2117 (2d ed. unabridged 1960). The provision thus applies to any action that a voter must take to vote. Section 10101 then defines "vote" to "include[] all action necessary to make a vote effective." 52 U.S.C. 10101(e). This language alone encompasses far more than the ability to register. But then the definition also specifies that it is "*not* limited" to

"registration," but extends to "*other* action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." *Ibid.* (emphases added).  Congress could not have chosen language better crafted to apply the Materiality Provision, not just to registration, but to all acts necessary at any stage of the voting process to cast and count one's vote—one of which is surely filling out any envelope in which a ballot is transmitted.

Below, Ritter relied on the canon of *ejusdem generis* to assert that the phrase "other act" is limited to acts like voter "registrations" or registration "applications."  JA677-678.  His reliance is misplaced.

For one thing, *ejusdem generis* does not apply where the specific list items do not all fall within the proffered category.  See, *e.g.*, *Harrison* v. *PPG Indus., Inc.*, 446 U.S. 578, 588 (1980).  The word "application" naturally reaches beyond voter registration applications—and indeed must do so to avoid surplusage concerns.  The words "application" and "registration," then, cannot jointly outline a category of documents related solely to the latter.

Instead, Congress already has dictated the relevant category by including the phrase "requisite to voting."  This final phrase modifies each of its three antecedents:  "application," "registration," and "other act."  See *Facebook, Inc.* v. *Duguid*, 141 S. Ct. 1163, 1169 (2021).  It indicates that the provision applies only

to those "acts"—and those "application[s]" or "registration[s]"—that are essential

preconditions *to voting*, 52 U.S.C. 10101(a)(2)(B), as opposed to some other

activity.  But Ritter does not, and cannot, deny that filling out any documents that

accompany one's ballot, such as the envelope for absentee ballots, is a

precondition to having one's vote counted.

Moreover, as noted above, the Materiality Provision uses the expansive

word "any" to modify the series that includes the phrase "other act."  In *Ali* v.

*Federal Bureau of Prisons*, the Supreme Court rejected the argument that

including the specific examples "officer of customs or excise" before the general

phrase "or any other law enforcement officer" limited that general phrase to

"officers acting in a customs or excise capacity."  552 U.S. at 218 (citation

omitted).  The Court determined that "Congress' use of 'any' to modify 'other law

enforcement officer' is most naturally read to mean law enforcement officers of

whatever kind."  *Id.* at 220; see *id.* at 219-220 (discussing cases reaching similar

results based on similarly-worded phrases).  Likewise, here, Congress's use of

"any" to modify "other act requisite to voting" is most naturally read to mean acts

of *whatever* kind that are necessary to cast a ballot and have it counted.  52 U.S.C.

10101(a)(2)(B).

At bottom, Ritter's interpretation would read the word "application," as well

as the phrase "any other act requisite to voting," out of the statute.  Ritter's "view

thus runs afoul of the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin* v. *United States*, 573 U.S. 351, 358 (2014) (citation omitted).  Courts cannot apply *ejusdem generis* to "render the general statutory language meaningless." *Christopher* v. *SmithKline Beecham Corp.*, 567 U.S. 142, 163 (2012).  Rather, the Materiality Provision should be read naturally:  It applies to errors or omissions in records or papers related to any act necessary to make one's vote effective.  A law like the dating requirement, which regulates an oath that voters must sign on the envelope in which voters must place their absentee ballots, fits snugly within the statutory text.  See, *e.g.*, *Martin*, 347 F. Supp. 3d at 1308-1309.

## CONCLUSION

For the foregoing reasons, the district court erred in granting summary judgment to defendants on plaintiffs' Materiality Provision claim.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rules 28.3(d) and 46.1(a), I hereby certify that I am exempt from the Third Circuit's bar admission requirement as counsel representing the United States.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  April 1, 2022

# CERTIFICATE OF COMPLIANCE

I certify that the attached BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS AND SUPPORTING REVERSAL:

(1) complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,469 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f);

(2) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point Times New Roman font; and

(3) complies with the requirements of Local Rule 31.1(c) that the text of the electronic brief is identical to the text in any paper copies of this brief that are submitted to the Court, and that the electronic version of this brief, prepared for submission via ECF, has been scanned with the most recent version of Windows Defender (Version 1.2.3412.0) and is virus-free according to that program.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  April 1, 2022

**CERTIFICATE OF SERVICE**

I certify that on April 1, 2022, I electronically filed the foregoing BRIEF

FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF

PLAINTIFFS-APPELLANTS AND SUPPORTING REVERSAL with the Clerk

of the Court for the United States Court of Appeals for the Third Circuit by using

the appellate CM/ECF system.  I also certify that seven (7) paper copies, identical

to the brief filed electronically, will be sent to the Clerk of the Court by Federal

Express.

I certify that all participants in this case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney
