No. 22-1499

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

LINDA MIGLIORI, et al.,

*Plaintiffs-Appellees*,

v.

LEHIGH COUNTY BOARD OF ELECTIONS, et al.,

*Defendants-Appellants*.

On appeal from the United States District Court for the
Eastern District of Pennsylvania, Case No. 5:22-cv-00397
(Hon. Joseph F. Leeson)

## BRIEF FOR APPELLEE DAVID RITTER

Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Eml: jvoss@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com
*Attorneys for David Ritter*

# TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................1

II.   STATEMENT OF ISSUES .................................................................2

III.  STATEMENT OF THE CASE ..........................................................3

   A. The 2020 election cycle and subsequent events ..............................3

   B. The 2021 Municipal Election in Lehigh County.............................7

   C. Pennsylvania state court litigation regarding the Disputed Ballots
      ............................................................................................................12

   D. The District Court proceedings.....................................................15

IV.   SUMMARY OF THE ARGUMENT .............................................20

V.    ARGUMENT .................................................................................22

   A. Voter Appellants' claims are barred under the doctrine of laches
      because they inexcusably delayed in bringing this action and the
      delay has prejudiced Ritter...........................................................22

   B. Voter Appellants' Materiality Provision claim fails procedurally
      and substantively. ........................................................................32

      1. Voter Appellants cannot enforce the Materiality Provision by
         private action.............................................................................33

         (a)  Voter Appellants' recourse to Section 1983's private
              action construct is unavailing. ........................................34

         (b)  The District Court correctly concluded that the text and
              structure of the Materiality Provision precludes a
              private right of action.....................................................38

      2. Assuming *arguendo* a private right of action exists, Section 101
         of the Civil Rights Act is wholly inapplicable and, in any event,

does not prohibit states from requesting that an elector's voter declaration be accompanied by a dated signature. ................... 43

    (a)  Section 101 of the Civil Rights Act is aimed at discriminatory conduct and, thus, is inapposite ............ 44

    (b)  The Materiality Provision is not implicated, since it applies exclusively to voter registration laws. .............. 46

    (c)  Even if applicable, Section 101 is not violated by requiring voters to furnish a dated signature on their voter declaration. .......................................................... 49

C. The Court lacks subject matter jurisdiction over all of Voter Appellants' claims, since they lack Article III standing for every item of relief they seek. ................................................................ 56

VI.    CONCLUSION ................................................................ 63

COMBINED CERTIFICATIONS.............................................................. I

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval*, 532 U.S. 275 (2001).................................. passim

*Ball v. Brown*, 450 F. Supp. 4 (N.D. Ohio 1977)....................................45

*Ballas v. Symm*, 351 F. Supp. 876 (S.D. Tex. 1972) ..............................45

*Belitskus v. Pizzingrilli*, 343 F.3d 632 (3d Cir. 2003)............................57

*Bonds v. Cox*, 20 F.3d 697 (6th Cir. 1994) ..............................................29

*Broyles v. Texas*, 618 F. Supp. 2d 661 (S.D. Tex. 2009).........................42

*Cartagena v. Crew*, No. 96-cv-3399, 1996 WL 524394 (E.D.N.Y. Sept. 5, 1996) ..................................................................................................42

*Case of Fry*, 71 Pa. 302 (1872)................................................................50

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001)........................47

*City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113 (2005) . 36, 37

*Com. v. Bobbino*, 18 A.2d 458 (Pa. Super. 1941) ...................................54

*Com. v. Petrillo*, 386 A.2d 590 (Pa. Super. 1978)...................................54

*Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995)............................46

*Contractors Ass'n of E. Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990 (3d Cir. 1993) ................................................................................57

*Crookston v. Johnson*, 842 F.3d 396 (6th Cir. 2016) .................. 23, 30, 32

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006) ....................................46

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59 (1978) ...................................................................................................57

*Ethyphram S.A. France v. Abbott Laboratories*, 707 F.3d 223 (3d Cir. 2013) ............................................................................... 22

*Evans v. United Parcel Serv., Inc.*, No. 19-cv-4818, 2022 WL 212346 (N.D. Ill. Jan. 21, 2022) ........................................................ 29

*Fishman v. Schaffer*, 429 U.S. 1325 (1976) ................................. 23

*Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ............................................................................... 45

*Frazier v. Callicutt*, 383 F. Supp. 15, 19 (N.D. Miss. 1974) ................... 45

*Free Speech Coalition, Inc. v. Att'y Gen. United States*, 974 F.3d 408 (3d Cir. 2020) .......................................................................... 62

*Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469 (3d Cir. 2016) ............................................. 57, 58

*Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004) ................. 46

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .......................................................................... 58

*Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271 (E.D.N.Y. 2004) ................................................................. 41

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) ...................... 34, 35, 36

*Good v. Roy*, 459 F. Supp. 403 (D. Kan. 1978) .............................. 42

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008) ................. 47

*Howlette v. City of Richmond, Va.*, 485 F. Supp. 17 (E.D. Va. 1978) ..... 55

*In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020) ....................................... passim

*In re Stabile*, 36 A.2d 451 (Pa. 1944) ...................................... 50

*Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006) ....................................................................45

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) ....................................................58

*Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770 (3d Cir. 2007) .........22

*Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701 (3d Cir. 2020) .............38

*Jones v. Jessup*, 615 S.E.2d 529 (Ga. 2005) ...........................................53

*Kars 4 Kids Inc. v. America Can!*, 8 F.4th 209 (3d Cir. 2021)...............22

*Kelly v. Commonwealth*, 240 A.3d 1255 (Pa. 2020) ...............................23

*King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020)................23, 30

*Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375 (3d Cir. 1994)......................................................36

*Maier v. Patterson*, 511 F. Supp. 436 (E.D. Pa. 1981) ...........................48

*Malinou v. Bd. of Elections*, 271 A.2d 798 (R.I. 1970) ...........................45

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018)................53

*McGovern v. City of Philadelphia*, 554 F.3d 114 (3d Cir. 2009).......38, 43

*McKay v. Altobello*, No. 96-cv-3458, 1996 WL 635987 (E.D. La. Oct. 31, 1996) ...........................................................................................42, 46

*McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000) ................................41

*Mixon v. Commonwealth*, 759 A.2d 442 (Pa. Cmwlth. 2000) .................52

*Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004)........................................23

*Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016) ................................................................................................41

*Northwestern Youth Services, Inc. v. Com., Dep't of Public Welfare*, 66 A.3d 301 (Pa. 2013) ................................................................................ 7

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) ................ 47

*Pa. Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) ............. 7, 61

*Pa. Democratic Party v. Republican Party of Pa.*, No. 16-cv-5664, 2016 WL 6582659 (E.D. Pa. Nov. 7, 2016) ................................................... 23

*Pearson v. Sec. Dept. of Corrections*, 775 F.3d 598 (3d Cir. 2015) .......... 23

*Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) . 61

*Perrotta v. Com., Dep't of Transp., Bureau of Driver Licensing*, 110 A.3d 255 (Pa. Cmwlth. 2015) ......................................................................... 7

*Ritter v. Lehigh Cty. Bd. of Elections*, No. 1322 C.D. 2021, 2022 WL 16577 (Pa. Cmwlth. Jan. 3, 2022) .................................................. 14, 52

*Ritter v. Lehigh Cty. Bd. of Elections*, No. 9 MAL 2022, 2022 WL 244122 (Pa. Jan. 27, 2022) ................................................................................. 15

*Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123 (3d Cir. 2005) ............................................................................ 22, 24

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ........................ 42, 43, 46

*Singh v. Uber Techs. Inc.*, 939 F.3d 210 (3d Cir. 2019) .......................... 47

*Spivey v. Ohio*, 999 F. Supp. 987 (N.D. Ohio 1998) ................................ 41

*Stein v. Cortes*, 223 F. Supp. 3d 423 (E.D. Pa. 2016) ..................... passim

*Thrasher v. Illinois Republican Party*, No. 12-cv-4071, 2013 WL 442832 (C.D. Ill. Feb. 5, 2013) .................................................................... 42, 46

*Three Rivers Ctr. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412 (3d Cir. 2004) ......................................................................................... 38

*U.S. v. Brown*, 849 F.3d 87 (3d Cir. 2017) .............................................. 58

*Williams v. Keisler*, No. 07-cv-503, 2007 WL 9723294, at * 4 (E.D.N.Y. Oct. 30, 2007) ................................................................................... 29

*Willing v. Lake Orion Community Sch. Bd. of Trustees*, 924 F. Supp. 815 (E.D. Mich. 1996) ............................................................................... 42

*Wisniewski v. Rodale, Inc.*, 510 F.3d 294 (3d Cir. 2007) ........................ 39

*Zepeda v. U.S. I.N.S.*, 753 F.2d 719 (9th Cir. 1983) ............................... 63

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ........................................... 42, 43

**Statutes**

25 P.S. § 2602 ......................................................................................... 61

25 P.S. § 2602(w) ..................................................................................... 52

25 P.S. § 2811 ...................................................................................... 50, 51

25 P.S. § 3146.6(a) .................................................................................. 3, 25

25 P.S. § 3146.8(g) .................................................................................. 62

25 P.S. § 3146.9(a) .................................................................................. 28

25 P.S. § 3150.14 ..................................................................................... 50

25 P.S. § 3150.16(a) ................................................................................ 3, 25

25 P.S. § 3157 .......................................................................................... 24

25 P.S. § 3263 .......................................................................................... 25

25 P.S. § 3313 .......................................................................................... 24

25 P.S. § 3456 .......................................................................................... 24

25 P.S. § 3552 .......................................................................................... 54

25 P.S. § 3553 .................................................................... 49, 54

28 U.S.C. § 1746 ..................................................................... 29

42 U.S.C. § 1983 ............................................................ 33, 34, 35

52 U.S.C. § 10101(a)(2)(B)................................. 14, 32, 47, 49

52 U.S.C. § 10101(a)(3)(A) ................................................... 48

52 U.S.C. § 10101(a), (c), (e) & (g)...................................... 39

52 U.S.C. § 10101(c) .............................................................. 39

52 U.S.C. § 10101(d) ............................................................. 40

52 U.S.C. § 10101(e) ....................................................... 48, 49

52 U.S.C. § 10101(f) .............................................................. 40

P.L. 41, No. 12, §§ 11, 14, 17(3) (Mar. 27, 2020).....................25

## Rules

Fed.R.Civ.P. 23.........................................................................59

## Regulations

204 Pa. Code § 211.2(d) ........................................................ 30

## Constitutional Provisions

Pa. Const. art. VII, § 4...........................................................61

## Other Authorities

*Ejusdem generis*, 2A Sutherland Statutory Construction § 47:17 (7th ed.) ..................................................................................48

Richard L. *Hasen, Beyond the Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown*, 62 Wash. & Lee L. Rev. 937 (2005)..............................................................23

*Voting by Untried Prisoners and Misdemeanants*, 67 Pa. D. & C.2d 449 (Op. Pa. Atty. Gen. 1974) ......................................................52

# I.     INTRODUCTION

After reviewing the November 2021 election at issue in this appeal, three courts have affirmed that Appellee David Ritter should be certified the winner. One of those courts—the District Court—did so *twice*. Regardless, once more this matter is before an appellate court, again asking that the election held five months ago be disturbed. As is set forth below, Voter Appellants have received all review, and all appropriate rulings, to which they are due. The law—for any number of reasons—simply does not permit these parties at this time and under these circumstances to prevail. Every lawful ballot, under Pennsylvania and Federal law, has been canvassed and no further action is warranted other than the final blessing of the valid results by the Lehigh County Board of Elections ("the Board"). Respectfully, Ritter requests that the Court immediately permit that outcome by affirming the District Court's summary judgment order. This election has been in dispute long enough, and the parties, and the citizens of Lehigh County, deserve to have the final office from the last election filled.

## II.   STATEMENT OF ISSUES

1.   Did the District Court abuse its discretion in finding the doctrine of laches did not bar Voter Appellants' claims, where the record reflects periods of delay, and resulting prejudice, exceeding any permissible period to lodge a challenge under the Election Code? *Suggest answer: Yes.*

2.   Did the District Court properly hold Voter Appellants lack standing to pursue a claim under the Materiality Provision, and is their claim otherwise barred? *Suggested answer: Yes.*

3.   Do Voter Appellants lack Article III standing to seek a permanent injunction requiring the Board to canvass all 257 undated voter declaration ballots? *Suggested answer: Yes.*

## III. STATEMENT OF THE CASE

### A. The 2020 election cycle and subsequent events

As it concerns the declaration on the outer envelope of an absentee or mail-in ballot, the Pennsylvania Election Code, in material part, states as follows: "The elector shall then fill out, date and sign the declaration printed on such envelope." JA166 at ¶ 6 (Joint Stipulated Facts, hereafter "Stip. Facts"); 25 P.S. §§ 3146.6(a) and 3150.16(a).[1] This provision was at the heart of several challenges during the 2020 election cycle, which resulted in the meaning of the provision being posed to the Pennsylvania Supreme Court in multiple consolidated appeals. JA166 at ¶ 7. This yielded a split 3-1-3 decision in *In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020), whereby a four-justice majority held the dated declaration requirement in Section 3150.16(a) is mandatory in all elections following the 2020 General Election. JA166 at ¶ 7.

After *In re Canvass*, a number of material events occurred concerning elections in Lehigh County and statewide. JA166 at ¶ 8. For

---

[1] Because the legal issues about the declaration on mail-in and absentee ballots are the same under the Election Code, the ballots are often referred to throughout this brief as simply "mail-in."

instance, after the opinion, the Board changed the outer envelope for mailed ballots. JA166-67 at ¶¶ 8-9; *compare* JA183-84 (containing the Board supplied envelope for absentee and mail-in voters for the 2020 election cycle), *with* JA185-87 (containing the Board supplied envelope for absentee and mail-in voters for the 2021 election cycle). Specifically, the Board added text to the flap regarding what must be done for the ballot to be counted:

> **Your ballot must have the following to be counted:**
> ☐ You sign and date the voter's declaration in your own handwriting
> ☐ You **seal** your ballot inside the white secrecy envelope ("Official Election Ballot") and place it in here

JA166-67 at ¶¶ 8-9; JA185-87. The Board also added the word "required" after the signature and date blocks of the voter declaration:

> Voter, sign or mark here (required) /
> Votante, firme o marque aquí (obligatorio)
>
> ✖
>
> Date (MM/DD/YYYY) (required) /
> Fecha (MM/DD/AAAA) (obligatorio)

JA166-67 at ¶¶ 8-9; JA185-87. The revised 2021 envelope also included the full voter's declaration:

> **Voter's declaration:** I hereby declare that I am qualified to vote in this election from the address stated on the reverse side of this envelope; that I have not already voted in this election; and I further declare that I marked my ballot in secret. I am qualified to vote the enclosed ballot. I understand I am no longer eligible to vote at my polling

4

place after I return my voted ballot. However, if my ballot is not received by the county, I understand I may only vote by provisional ballot at my polling place, unless I surrender my balloting materials, to be voided, to the judge of elections at my polling place.

JA187. The Board's revised 2021 envelope was approved by the Secretary of the Commonwealth. JA167 at ¶ 10.

Further still, for the 2021 election, the Board supplied standalone instructions to each potential mail-in voter, which gave additional information on the date requirement, stating (in all caps): "**FOR YOUR BALLOT TO BE COUNTED**" the elector must "2. Sign and date the return envelope[,]" with further instructions telling the elector to "**Sign** and write **today's date** in the Voter's Declaration section." JA589 (Ritter Summary Judgment Brief) (emphasis in original); JA167 at ¶¶ 11-12 (Stip. Facts).[2] That same instruction card included this admonition: "**If you do not follow these instructions, your ballot will be rejected**." JA589 (emphasis in original).

---

[2] The instruction card is reproduced in the Joint Appendix at JA189; however, seemingly during the production of the Appendix, the exhibit at JA189 was inadvertently modified, with the all caps line removed. The original version of voter instruction card, showing all of the text, can be found in the District Court record at ECF 27-4, and also in Ritter's Summary Judgment Brief at JA589.

During the 2021 primary, Lehigh County **did not** count mail-in ballots with an undated declaration on the envelope. JA244, Tr. at 51:12-15 (Board Nov. 15, 2021 public hearing transcript, hereinafter "Board Hearing Tr."); JA30-07, Tr. 28:13-15, 29:2-4 (Lehigh County Court of Common Pleas Nov. 22, 2021 hearing transcript, hereinafter "Common Pleas Hearing Tr.").

Next, the Supreme Court's opinion directly caused the Pennsylvania Department of State to issue supplemental guidance to the various county election boards for the 2021 Municipal Election. JA167 at ¶ 13. The Department did so via a June 1, 2021 email, with the subject line "DOS Email: Reminder Regarding Requirement to Sign AND Date Declaration Envelopes." JA167 at ¶¶ 13-14; JA191-92. The guidance stated:

> Since the Municipal Primary on May 18, the department has seen several news articles suggesting that some counties are continuing to accept and count ballots that do not contain both a signature and a date on the voter's declaration.
>
> As you know, the department updated the content and the instructions on the declaration envelope to ensure that voters know they must **sign and date** the envelope for their ballot to be counted. Furthermore, our updated guidance is consistent with the Supreme Court's ruling last September in *In Re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, wherein the Court held

6

that in future elections a voter's declaration envelope must be both signed and dated for the ballot to count. Though we share your desire to prevent the disenfranchisement of any voter, particularly when it occurs because of a voter's inadvertent error, we must strongly urge all counties to abide by the Court's interpretation of this statutory requirement.

We also believe that it is prudent to again remind you of our previous clarification of 10/25/2020. As noted in that communication, there is no basis to reject a ballot for putting the "wrong" date on the envelope, nor is the date written used to determine the eligibility of the voter. You should process these ballots normally.

....

JA192 (emphasis in original).[3]

## B.     The 2021 Municipal Election in Lehigh County

This dispute concerns 261 mail-in ballots with two date issues on

the outer envelope (hereafter, "the Disputed Ballots"): 257 had no date

---

[3] The Department of State's emailed interpretive guidance that a wrong date placed on a mail-in or absentee ballot voter declaration is valid has not been subjected to judicial review. Thus, this informal position is merely the Department's untested belief, which is entitled to little deference. *See Perrotta v. Com., Dep't of Transp., Bureau of Driver Licensing*, 110 A.3d 255, 259 (Pa. Cmwlth. 2015); *see also Northwestern Youth Services, Inc. v. Com., Dep't of Public Welfare*, 66 A.3d 301, 311-12 (Pa. 2013) (discussing lower deference given to interpretive rules). In fact, as it concerns mail-in and absentee voting in particular, the Pennsylvania Supreme Court has expressly rejected similar interpretive rules from the Department of State. *See Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 376 n.29, 378 (Pa. 2020).

on the declaration, while 4 had a date in the wrong place. JA168 at ¶ 23. The Disputed Ballots were all timely received by the Board and none are the subject of known or suspected fraud. JA169 at ¶ 26. As of the date of this brief, the contents of the ballots within the Disputed Ballots (save for the 4 wrong-place-date ballots, described below) remain unknown to anyone; *i.e.*, which candidates would receive additional votes is unknown. JA171 at ¶ 51. The Disputed Ballots were the subject of extensive Pennsylvania state court proceedings described more fully below. JA168-171 at ¶¶ 23, 30-50.

The Disputed Ballots are potentially material to a single election in Lehigh County. JA167 at ¶ 16. Specifically, David Ritter is a candidate for the office of Judge of the Court of Common Pleas. JA167-68, JA176 at ¶¶ 18-19, 95. Three vacancies for such office were on the November 2, 2021 ballot, with six candidates vying for the three available offices. JA167 at ¶ 17. As of November 15, 2021, Ritter had received the third-most votes from the Municipal Election, leading the fourth-place candidate, Zachary Cohen, by 74 votes. JA167 at ¶ 18. The overall vote totals were as follows:

| Candidate | Vote Total |
|---|---|
| Tom Caffrey (REP) | 35,301 |
| Tom Capehart (REP) | 33,017 |
| David Ritter (REP) | 32,602 |
|  |  |
| Zachary Cohen (DEM) | 32,528 |
| Maraleen Shields (DEM) | 32,041 |
| Rashid Santiago (DEM) | 29,453 |

JA168 at ¶ 19. Judges Tom Caffrey and Tom Capehart have already been sworn in as commissioned judges in Lehigh County; they were sworn in on or about January 3, 2022. JA168 at ¶ 20.

Approximately 72,000 electors have had their ballots tallied in Lehigh County from the 2021 Municipal Election. JA168 at ¶ 21. Thus the Disputed Ballots concern less than half of one percent of all ballots counted to date. Of the over 70,000 ballots counted in Lehigh County, approximately 22,000 were cast by mail-in ballot. JA168 at ¶ 21.

As the Board received mail-in ballots for the November 2 election, if they did not have a date on the voter declaration, or had a date in the wrong place, they were set aside. JA168 at ¶ 22. The Board then marked those ballots "cancelled" in the Statewide Uniform Registry of Electors ("SURE") system. JA169 at ¶ 28. The Pennsylvania Department of State developed the SURE system. JA169 at ¶ 27. It contains various information about each elector in the Commonwealth,

and county boards of election, like the Board, are able to access the

SURE system to add, modify, or delete information in the system as

necessary. JA168 at ¶ 27. The Board's change in the SURE system was

designed to cause an automatically generated email to be sent by the

Department of State, from the email address <u>RA-voterregstatcert@state</u>

<u>.pa.us</u>, to the impacted elector if he or she had an email address on file.

JA169 at ¶ 29.[4] An example of such an email, sent to Appellant Linda

Migliori on October 29, 2021 after her ballot was marked cancelled in

the SURE system, states:

> Dear LINDA D MIGLIORI,
>
> Your ballot has been received by LEHIGH County on
> 10/29/2021.
>
> Your ballot status has been updated to cancelled because it
> cannot be counted due to voting at the polling place.
>
> If you have questions about your ballot, please contact
> LEHIGH County at (610) 782-3194.
>
> ….

---

[4] Moreover, for the 2021 election, the Pennsylvania Department of
State maintained a website where voters could check the status of their
ballots; that website was: <u>www.pavoterservices.pa.gov/Pages/Ballot</u>
<u>_Tracking.aspx</u>. JA48 at ¶ 22 (Complaint).

JA172 at ¶¶ 59, 61-62; JA459-60. Appellant Richard Richards also received some kind of email notice regarding his ballot before the November 2 election, but he has since lost that email. JA174 at ¶ 74.

The cancelling of the ballots by the Board did not eliminate the elector's ability to vote. JA170 at ¶¶ 36-37; JA332, Tr. at 54:5-11 (Common Pleas Hearing Tr.). To the contrary, after the Board cancelled a ballot, the Board afforded the elector the opportunity to cure their ballot defect(s), including missing dates on the voter declaration. JA170 at ¶¶ 36-37; JA332, Tr. at 54:12-20 (Common Pleas Hearing Tr.). The Board's chief clerk testified in court that some electors chose to cure their cancelled ballots in advance of the November 2, 2021 election. JA170 at ¶¶ 36-37; JA332-33, Tr. at 54:21-55:3 (Common Pleas Hearing Tr.).[5]

---

[5] Q.    Did any voters – did voters have an opportunity to cure those defects prior to or on Election Day?
A.    Certain defects, yes.
Q.    Was the date defect one of them?
A.    Yes it was.
Q.    Did any voters come in to cure that defect?
A.    They did.
JA332-33, Tr. at 54:21-55:3 (Common Pleas Hearing Tr.).

### C. Pennsylvania state court litigation regarding the Disputed Ballots

After the November 2 election, the Board convened a hearing on November 15, 2021 to consider the Disputed Ballots. JA169 at ¶ 30. Both Ritter and Candidate Cohen presented argument regarding the Disputed Ballots. JA170 at ¶ 33; JA226-64, Tr. at 35:5-71:6 (Board Hearing Tr.). The Board also heard testimony from the chief clerk to the Board. The chief clerk testified that it was his opinion the undated declaration ballots were not effective, and should not be counted, because they did not meet the requirements to be counted, based on his discussion with the Law Department. JA244, Tr. at 51:3-11 (Board Hearing Tr.). The Board's solicitor also stated that he understood that the Pennsylvania Department of State had advised that a dated declaration was required. JA249-50, Tr. at 56:23-57:10 (Board Hearing Tr.). Despite this testimony from the chief clerk and the statement from the solicitor, the Board voted 3-0 to count the Disputed Ballots. JA170 at ¶ 34; JA257-59, Tr. at 64:18-66:2 (Board Hearing Tr.).

On November 17, 2021, Ritter promptly filed an appeal of the Board's decision to count the Disputed Ballots with the Court of Common Pleas of Lehigh County. JA170 at ¶ 35.

After the appeal was filed, on or about November 20, 2021, after reviewing the Disputed Ballots, staff working on behalf of candidate Zac Cohen were able to generate a list of electors whose voter declaration was undated. JA169 at ¶ 25. The list reflected their names, address, party registration, and age. JA169 at ¶ 25.

The Lehigh County trial court held an evidentiary hearing, and then heard argument, at a transcribed hearing on November 22, 2021. JA170 at ¶ 36. The Court heard testimony from the Board's chief clerk. JA289-90, JA337, Tr. at 11:14-12:2, 59:7-20 (Common Pleas Hearing Tr.). The court also heard testimony from Richard Richards, one of the Appellants in this matter. JA337-41, Tr. at 59:4-63:20 (Common Pleas Hearing Tr.). The trial court later issued an opinion and order on November 30, 2021, which affirmed the Board's decision to count the Disputed Ballots. JA170 at ¶ 38; JA397-416 (November 30, 2021 opinion and order).

On December 1, 2021, Ritter appealed the trial court's decision to the Pennsylvania Commonwealth Court and argued, *inter alia*, that the Court of Common Pleas had no authority to ignore *In re Canvass*. JA170 at ¶ 40. The next day, on December 2, 2021, Ritter filed for a

stay pending appeal with the Court of Common Pleas, and that stay was granted on December 3, 2021, which prohibited the Board from opening and counting the Disputed Ballots. JA170 at ¶¶ 41-42.

On January 3, 2022, the Commonwealth Court issued an opinion and order, and relying on *In re Canvass*, concluded 257 of the Disputed Ballots could not be counted, while permitting the 4 wrong-date-location ballots to be canvassed. *See Ritter v. Lehigh Cty. Bd. of Elections*, No. 1322 C.D. 2021, 2022 WL 16577 (Pa. Cmwlth. Jan. 3, 2022); JA170-71 at ¶¶ 43-44; JA417-43 (Commonwealth Court January 3, 2022 opinion and order). As is material here, not only did the Commonwealth Court hold the Disputed Ballots could not be counted under the Pennsylvania Election Code, the Court further ruled the Materiality Provision, 52 U.S.C. § 10101(a)(2)(B), was "inapplicable," and further ruled that even if it did apply, it was not violated because "the dating of mail-in ballots is a 'material' requisite under the Election Code[.]" *See Ritter*, 2022 WL 16577, at *9.

Candidate Cohen filed a petition for allowance of appeal with the Pennsylvania Supreme Court on January 7, 2022. JA171 at ¶ 45. On January 27, 2022, the Pennsylvania Supreme Court denied the petition.

*Ritter v. Lehigh Cty. Bd. of Elections*, No. 9 MAL 2022, 2022 WL 244122
(Pa. Jan. 27, 2022); JA171 at ¶ 46; JA444-45 (Pennsylvania Supreme
Court's January 27, 2022 order).

Following that decision, also on January 27, 2022, the Lehigh
County Court of Common Pleas issued an order directing the Board "to
exclude the 257 ballots at issue in this case that fail to include a date on
the return envelope from the certified returns of the 2021 municipal
election of Lehigh County." JA171 at ¶ 48; JA446-47 (Court of Common
Pleas of Lehigh County January 27, 2022 order). On January 31, 2022,
the Board canvassed the 4 ballots that contained dates in the wrong
location, which yielded 3 additional votes for Candidate Cohen,
reducing Ritter's vote lead to 71. JA171 at ¶ 50. The Board has not yet
fully and finally certified the election results from the November 2
election. JA171 at ¶ 52.

## D.    The District Court proceedings

On January 31, 2022, ninety days after the November 2, 2021
election, Plaintiffs-Appellants filed their Complaint in the District
Court challenging the adjudication of the 257 mail-in ballots that have
no date on the voter declaration. JA40-131 (Complaint). Plaintiffs

asserted the following three claims: Count I (Violation of the Materiality Provision of the Civil Rights Act), Count II (Undue Burden on the Right to Vote Under the First and Fourteenth Amendment), and Count III (Denial of Voting Rights Without Notice and Procedural Due Process). JA52-59 at ¶¶ 38-63 (Complaint). On February 10, 2022, Plaintiffs stipulated to dismiss Count III. JA163-64.

All five of the Appellants submitted mail-in ballots with no date on the voter declaration, and thus their ballots are among the remaining 257 ballots from the Disputed Ballots. JA172 at ¶¶ 53-54; JA448-58 (copies of the outer envelopes of Voter Appellants' November 2, 2021 ballots).

Appellant Linda Migliori's mail-in ballot was received by the Board on October 28, 2021. JA172 at ¶ 58. The Board marked her ballot cancelled in the SURE system on October 29, 2021. JA172 at ¶ 59. Appellant Migliori has a valid email address on file in the SURE system. JA172 at ¶ 60. On October 29, 2021, Appellant Migliori received an email, from RA-voterregstatcert@state.pa.us. JA172 at ¶ 61; JA459-60 (October 29, 2021 email sent to Appellant Migliori regarding her cancelled ballot).

Appellant Francis Fox's mail-in ballot was received by the Board on October 18, 2021. JA173 at ¶ 66. The Board marked his ballot cancelled in the SURE system on October 20, 2021. JA173 at ¶ 67. Appellant Fox does not have a valid email address on file in the SURE system. JA173 at ¶ 68.

Appellant Richard Richards's mail-in ballot was received by the Board on October 14, 2021. JA174 at ¶ 73. Appellant Richards received an email confirmation from the Board that it had received his mail-in ballot; he no longer has a copy of that email. JA174 at ¶ 74. The Board marked his ballot cancelled in the SURE system on October 20, 2021. JA174 at ¶ 75. Appellant Richards has a valid email address on file in the SURE system. JA174 at ¶ 76. Appellant Richards testified regarding his undated declaration during the hearing before the Court of Common Pleas on November 22, 2021. JA337-41, Tr. at 59:4-63:20 (Common Pleas Hearing Tr.).

Appellant Kenneth Ringer's mail-in ballot was received by the Board on November 1, 2021. JA174 at ¶ 83. The Board marked his ballot cancelled in the SURE system on November 1, 2021. JA175 at

¶ 84. Appellant Ringer has a valid email address on file in the SURE system. JA175 at ¶ 85.

Appellant Sergio Rivas' mail-in ballot was received by the Board on October 25, 2021. JA175 at ¶ 90. The Board marked his ballot cancelled in the SURE system on October 26, 2021. JA175 at ¶ 91. Appellant Rivas does not have a valid email address on file in the SURE system. JA175 at ¶ 92.

Ritter is a licensed Pennsylvania attorney, and a candidate for Judge of the Court of Common Pleas of Lehigh County on the November 2, 2021 ballot. JA176 at ¶ 95. The Board is a 3-member board established under the Election Code, whose responsibilities include canvassing ballots and certifying to the Pennsylvania Department of State election results. JA176 at ¶ 96.

On February 1, 2022, Ritter filed a motion to intervene in the District Court, which was granted on February 2, 2022. JA141-45. The District Court further ordered that Ritter's Answer, which was attached to the Motion to Intervene, was deemed to be filed. JA145. Ritter's Answer contained several affirmative defenses, including laches and res judicata. JA146-58.

By way of stipulation filed on February 7, 2022—and granted on February 8—the parties agreed to proceed with cross-motions for summary judgment, based on stipulated facts. JA159-62. The joint stipulated facts were submitted on February 10, 2022. JA165-459 (Stip. Facts and Exhibits). The parties then briefed their responsive motions. Later, the parties agreed to forgo oral argument on the motions.

By way of opinion and order dated March 16, 2022, the District Court granted the summary judgment motions filed by the Board and by Ritter, and denied Voter Appellants' motion. JA4-33. Voter Appellants then moved for an injunction pending appeal, which the District Court denied. JA824-31.

## IV.  SUMMARY OF THE ARGUMENT

The District Court abused its discretion in failing to dismiss all of Voter Appellants' claims under the doctrine of laches. Before filing for relief, Voter Appellants serially sat on their rights for periods longer than any period the Pennsylvania Election Code affords an elector to lodge an election challenge. Under caselaw in this Circuit, reference to the Election Code is appropriate for determining the reasonableness of delay for a laches analysis.

The District Court's analysis of the Materiality Provision is correct. The Civil Rights Act does not expressly supply a private right of action to enforce the Provision, and precedent of both the Supreme Court and this Court show that no implied right can be afforded. Voter Appellants new-found Section 1983 analysis is both waived and incorrect. Further, the District Court's conclusion was in accord with the same finding of the Sixth Circuit Court of Appeals, among other courts. The Eleventh Circuit Court of Appeals' analysis to the contrary should be disregarded, for the reasons stated by the District Court.

Even if this Court finds the Materiality Provision is enforceable through a private action, Voter Appellants still cannot prevail for any of

three additional reasons. One, the Materiality Provision is applicable only to discriminatory practices, which are not present here. Two, it applies only to certain voter registration applications and other similar papers, and the voter declaration on a mail-in ballot is not such a paper. Three, the date on the voter Declaration is material (1) as part of the state process to determine elector eligibility, and (2) as part of the state's anti-fraud mechanisms.

Finally, Voter Appellants lack Article III standing, and consequently, this Court lacks subject matter jurisdiction over all of the relief they seek. Voter Appellants ask the Court to enter an injunction requiring the Board to canvass all 257 ballots. Yet Voter Appellants represent only 5 of the impacted electors, and they note repeatedly the rights they are vindicating are "personal" ones. Voter Appellants have suffered no injury-in-fact from an injury to the personal rights of others. Furthermore, the non-appearing electors are not factually on the same footing, as there is no record whether those electors' ballots can be "canvassed" under Pennsylvania law, since there is no record to show if they complied with the secrecy envelope requirement.

## V. ARGUMENT

### A. Voter Appellants' claims are barred under the doctrine of laches because they inexcusably delayed in bringing this action and the delay has prejudiced Ritter.

The District Court's conclusion that Voter Appellants had not inexcusably delayed was an abuse of discretion. *See Kars 4 Kids Inc. v. America Can!*, 8 F.4th 209, 219 n.10 (3d Cir. 2021) ("Because laches is an equitable doctrine, we review the District Court's decision for abuse of discretion." (quotations removed)). This Court should apply the doctrine of laches in this matter as another basis to affirm the District Court's summary judgment order and to bar Voter Appellants' claims. *See Ethyphram S.A. France v. Abbott Laboratories*, 707 F.3d 223, 232 n.15 (3d Cir. 2013); *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 781 n.19 (3d Cir. 2007).

Laches has two elements: "(1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay." *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 138 (3d Cir. 2005). In assessing delay for laches, a court can use the potentially applicable statute of limitations as a guide. *See id.* Reference to state law for purposes of assessing the timeliness of an action is

necessary since state law provides the time within which such a claim must be brought. *See Pearson v. Sec. Dept. of Corrections*, 775 F.3d 598, 602 (3d Cir. 2015). Laches is particularly appropriate to apply in election cases, given the tight statutory deadlines and the negative impact on the public with unresolved elections. *See King v. Whitmer*, 505 F. Supp. 3d 720, 731 (E.D. Mich. 2020) ("Courts apply laches in election cases." (citing cases)); *see also Crookston v. Johnson*, 842 F.3d 396, 398 (6th Cir. 2016); *Stein v. Cortes*, 223 F. Supp. 3d 423, 436 (E.D. Pa. 2016); *Pa. Democratic Party v. Republican Party of Pa.*, No. 16-cv-5664, 2016 WL 6582659, at *4 (E.D. Pa. Nov. 7, 2016); *see generally Fishman v. Schaffer*, 429 U.S. 1325, 1327-28 (1976) (Marshall, J.) (single justice opinion denying application for injunction in election matter where district court found suit barred based on laches); *Nader v. Keith*, 385 F.3d 729, 736-37 (7th Cir. 2004) ("By waiting as long as he did to sue … Nader created a situation in which any remedial order would throw the state's preparations for the election into turmoil.").[6]

---

[6] *Cf. Kelly v. Commonwealth*, 240 A.3d 1255, 1258 n.2 (Pa. 2020) (Wecht, J., concurring) (citing Richard L. *Hasen, Beyond the Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown*, 62 Wash. & Lee L. Rev. 937, 998 (2005) ("Courts should see it as in the public interest in election law cases to aggressively apply

To begin the analysis, Voter Appellants inexcusably delayed in bringing this action. As was noted in *Stein*, the Pennsylvania Election Code has various post-election deadlines for challenging the results thereof, all of which are extremely short. *See* 223 F. Supp. 3d at 427-28. That Court recognized the "Commonwealth has an obvious interest in regulating the conduct of elections," and noted that giving federal relief could "effectively" result in a court "nullify[ing] the Pennsylvania Election Code provisions applied by State Courts and Boards[.]" *See id.* at 436. Here, the most relevant Election Code provision is found in 25 P.S. § 3157. Notably, that is the provision invoked by Ritter in initiating his state court appeal. The two-day provision in Section 3157 establishes the appropriate reference point for assessing Voter Appellants' inexcusable delay. *Cf. Santana Products*, 401 F.3d at 138. Furthermore, though there are several ways to challenge election results, and several classes of challenges, the *longest* post-election deadline in the Election Code to lodge such a dispute is a **mere twenty days**. *See* 25 P.S. § 3456; *see also* 25 P.S. § 3313 (providing only 10

---

laches so as to prevent litigants from securing options over election administration problems.")).

days); 25 P.S. § 3263 (providing only 5 days); *see generally Stein*, 223 F. Supp. 3d at 427-28 (discussing challenges to election results under Election Code).

Here, Voter Appellants serially and inexcusably sat on their claimed rights. The District Court's determination otherwise was based only upon the timing of Voter Appellants' Complaint in relation to the Supreme Court's decision on the *discretionary* appeal (the Commonwealth Court appeal was the last appeal of right), but a comprehensive review of the entire election cycle reveals various points of delay prior to that. For starters, the Election Code provisions at issue, 25 P.S. §§ 3146.6(a) & 3150.16(a)—both of which require an elector to "date and sign the declaration"—were made effective for all envelopes used for every election after March 27, 2020 by Act 12 of 2020. P.L. 41, No. 12, §§ 11, 14, 17(3) (Mar. 27, 2020). In the intervening **almost two years** from enactment of Act 12 to the date of the Complaint, Voter Appellants never raised a challenge to the dating requirement even though, under their theory, the date requirement has always violated the Materiality Provision.

Next, the election was held on November 2, 2021. By that date, the Board staff had already cancelled, and set aside, all undated declaration mail-in ballots. JA168, JA172-75 at ¶¶ 22, 28, 59, 67, 75, 84, 91 (Stip. Facts). Appellant Migliori in particular had been sent an email, on October 29, 2021, notifying her that her ballot had been cancelled. JA172 at ¶ 61-62; JA459-60. Appellant Richards also received some kind of email regarding his ballot, but he no longer has it, so what it said exactly is unknown because of his own actions and delay. JA174 at ¶ 74. Regardless, Voter Appellants did nothing about the decision to cancel their ballots before election day, which cancellation they could have learned about by checking their email, contacting the Board, or checking the Department of State website.

Next, some thirteen days after the election (during which period their ballots were deemed cancelled and had not been counted) at the November 15, 2021 public hearing of the Board, judicial candidate Zac Cohen expressly asked the Board to overturn the staff decision, which only then the Board agreed to do. JA169-70 at ¶¶ 30-34; JA228-29, Tr. at 35:18-36:4 (Board Hearing Tr.). Just two days later, on November 17, 2021, Ritter filed a statutory appeal in the Court of Common Pleas,

challenging the counting of these undated declaration ballots. JA170 at ¶ 35. That *public* proceeding lasted from November 17 until November 30, 2021, when the trial court issued its opinion. JA170 at ¶¶ 35-39. In those intervening two weeks when the validity of the undated voter declaration ballots was very much in doubt, Voter Appellants did nothing to protect their rights.

And by the time of the Common Pleas hearing, Voter Appellants cannot credibly claim they didn't know their rights were in jeopardy, at least not all of them. Named Appellant in this matter—Richard Richards—*was a witness in the evidentiary hearing* before Common Pleas, and was such a witness solely for the purpose of discussing his undated voter declaration. JA170 at ¶¶ 36-37; JA337-41, Tr. at 59:15-63:25 (Common Pleas Hearing Tr.). Still, Voter Appellants initiated no proceedings to protect their rights. And any notion that Voter Appellants could not have known by this time that their ballots had been set aside cannot be credited, because by no later than November 20, 2021, candidate Cohen himself (*i.e.*, someone whose ballot had not been set aside) was able to generate a list of all electors within the Disputed Ballots, including their name, address, phone number, and

age. JA169 at ¶ 25. This confirms the information was *knowable* and *known*. *See also* 25 P.S. § 3146.9(a) ("All official absentee ballots, files, applications for such ballots and envelopes on which the executed declarations appear, and all information and lists are hereby designated and declared to be public records ....").

Voter Appellants' serial, inexcusable delays, continued from there. After Ritter appealed to the Commonwealth Court on December 1, Voter Appellants did nothing. JA170 at ¶ 40. Next, when by public order the trial court stayed counting of the undated declaration ballots on December 3, 2021, Voter Appellants continued to do nothing. JA170 at ¶ 42. When Ritter prevailed in the Commonwealth Court on January 3, 2022, Voter Appellants still did nothing. JA170-71 at ¶¶ 43-44. Further, even after the Pennsylvania Supreme Court on January 27, 2022 denied discretionary review of the Commonwealth Court's January 3 opinion, JA171 at ¶¶ 46-47, and after the Common Pleas Court ordered the Board to proceed with its certification, JA171 at ¶ 48, Voter Appellants waited another *four days* before going to the District Court seeking "emergency" relief, despite all of the Appellants signing,

**and dating**, their declarations in support of emergency relief on
January 30. *See* JA40-77 (Voter Appellants' declarations).[7]

In sum, between the material dates described above, and the date
of filing, Voter Appellants delayed by each and all of the following
measures:

| Event | Date | Delay From Event to January 31, 2022 Filing |
|---|---|---|
| Act 12 of 2020 Enacted | Mar. 27, 2020 | Approx. 22 months |
| Email to Linda Migliori | Oct. 29, 2021 | 94 days |
| Municipal Election | Nov. 2, 2021 | 90 days |
| Board Public Hearing | Nov. 15, 2021 | 77 days |
| Ritter Appeal to Common Pleas | Nov. 17, 2021 | 75 days |
| Cohen Campaign Generating List of Electors | Nov. 20, 2021 | 72 days |
| Richard Richards Testimony in Common Pleas | Nov. 22, 2021 | 70 days |
| Ritter Appeal to Commonwealth Court | Dec. 1, 2021 | 61 days |
| Common Pleas Stay Order | Dec. 3, 2021 | 59 days |
| Commonwealth Court Decision | Jan. 3, 2022 | 28 days |
| Supreme Court Denial of Discretionary Appeal | Jan. 27, 2022 | 4 days |

---

[7] Each Voter Appellant submitted to the District Court a dated
declaration under 28 U.S.C. § 1746. JA62-77. A declaration under
Section 1746 submitted without a date can be ignored. *See Bonds v.
Cox*, 20 F.3d 697, 702 (6th Cir. 1994); *Evans v. United Parcel Serv., Inc.*,
No. 19-cv-4818, 2022 WL 212346, at *2 (N.D. Ill. Jan. 21, 2022);
*Williams v. Keisler*, No. 07-cv-503, 2007 WL 9723294 (E.D.N.Y. Oct. 30,
2007).

Against the foregoing, and in light of the State statutory and Federal caselaw expectation that election-rated challenges must be pursued swiftly, Voter Appellants inexcusably delayed in pursing their dispute. *Cf. King*, 505 F. Supp. 3d at 731-32 (finding inexcusable delay for laches purposes where plaintiffs waited 21 days after election to file suit); *Stein*, 223 F. Supp. 3d at 437 (finding delay in filing action just three weeks after election was without "credible justification"). This is especially so under the rubric employed in *Stein*, where the Court made note that the elections machines challenged had been used for years before the untimely challenge. *See* 223 F. Supp. 3d at 436-37; *see also Crookston*, 841 F.3d at 399-40 (applying laches where challenged election laws had been on the books for many years). Likewise, here, the challenged law has been part of elections in the Commonwealth since envelopes were first printed and used under it in March 2020.

Voter Appellants' inexcusable delay has also prejudiced Ritter. For starters, but-for this late-filed challenge, he would have been certified as the final winner of the November 2 election for Judge (which would have carried certain salary and benefit entitlements, *see* 204 Pa. Code § 211.2(d)). JA171 at ¶ 50. Once sworn in, he would have been able to

pursue his public service on behalf of the citizens of Lehigh County, who face a significant civil case back-log, which grows no shorter with the bench down a judge. *See* JA605606 (Ritter Summary Judgment Brief) (citing Unified Judicial System of Pennsylvania, *County Caseload Statistics*, *Lehigh County*, at 3 (showing 2,351 civil actions pending as of 12/31/2020, the last date for which statistics are presently reported)).

Next, Voter Appellants' delay has also prejudiced Ritter's defense of this matter in that some of the relevant evidence has been lost due to Voter Appellants' delay. Indeed, in Voter Appellants' Complaint, they cite the Pennsylvania Department of State's election website as a material source for how voters could have checked the status of their mail-in ballots during the 2021 election. *See* JA48 at ¶ 22 (Complaint). Yet a visit to that website today shows the information has been taken down, with the message "PA Voter Services is temporarily unavailable," being posted instead. This means whatever information Ritter could have learned about the notice Voter Appellants' received during the election about the cancellation of their ballots is forever lost due to Voter Appellants' delay. Notably too, at least one of the Appellants— Richard Richards—received some kind of email notice regarding his

ballot before election day, but he no longer has that email; *i.e.*, yet more material evidence has been lost. JA173 at ¶ 71 (Stip. Facts).

Finally, the Commonwealth has an interest in holding "orderly elections," and Ritter, as a candidate for one of those elections, and a presumptive winner thereof, is prejudiced when the Commonwealth's interest in the final disposition of an election—*held over five months ago*—remains indefinitely delayed. *See Crookston*, 841 F.3d at 399 ("Crookson's belated challenge to Michigan's election procedures prejudices the State's interest in holding orderly elections."); *see also Stein*, 223 F. Supp. 3d at 436 ("The Commonwealth has an obvious interest in regulating the conduct of its elections."). For each of the foregoing reasons, Ritter has been prejudiced by Voter Appellants' unreasonable delay.

Accordingly, because each of the elements for laches are met, this Court should summarily reject all of Voter Appellants' claims.

## B. Voter Appellants' Materiality Provision claim fails procedurally and substantively.

This Court should affirm the District Court's decision because, at bottom, Voter Appellants cannot obtain relief under the Materiality Provision, 52 U.S.C. § 10101(a)(2)(B). To begin, as the District Court

explained, Section 101 of the Civil Rights Action may not be enforced by private action. Nothing in Voter Appellants' submissions to this Court— including their newly formulated argument that 42 U.S.C. § 1983 provides a direct right of action—militates in favor of a contrary conclusion. Also, three additional grounds, set forth in subsection 2 below, bar their success on the claim.

## 1. Voter Appellants cannot enforce the Materiality Provision by private action.

Voter Appellants' argument that they are entitled to relief under the Materiality Provision—which, for the first time, has taken a two-fold dimension—should be rejected. Appellants' lead argument is that the Materiality Provision is enforceable via Section 1983, irrespective of whether the two-part inquiry in *Alexander v. Sandoval*, 532 U.S. 275 (2001), has been satisfied. But Voter Appellants' newly formulated theory was not developed below and, therefore, is waived. Moreover, even if properly preserved, this argument lacks merit largely for the same reasons articulated by the District Court. Specifically, while Voter Appellants are correct that "[w]hether a statute is privately enforceable under Section 1983 and whether it is enforceable on its own via an implied right of action are separate … inquiries[,]" Appellants Br. at 20,

they significantly overstate the distinction between the two. In the end, neither framework permits a private right of action, as here, the statute sought to be enforced contains a detailed remedial scheme that does not include private actions.

As for Voter Appellants' alternative argument, which was the only one advanced below, the District Court faithfully applied controlling precedent in concluding an implied right of action does not exist under Section 101 and, thus, its decision in this respect should be affirmed.

### (a) Voter Appellants' recourse to Section 1983's private action construct is unavailing.

Voter Appellants' principal argument in support of reversal is that "under the proper analysis for Section 1983 claims, established by *Gonzaga University v. Doe*, 536 U.S. 273 (2002), [they] plainly can bring suit to enforce the individual rights guaranteed by the Materiality Provision." Appellants Br. at 19. Specifically, Voter Appellants insist that under *Gonzaga*, once Congressional intent to create a private right is established, it is presumptively enforceable under Section 1983—and, "[i]n practice," they argue, that presumption is "rarely rebutted." *Id.* at 20. Voter Appellants' (belated) recourse to *Gonzaga*, however, is both procedurally and substantively misplaced.

Above all else, while Voter Appellants unequivocally declare they "sued under Section 1983 here[,]" *id.* at 19, a review of the record yields little indication to that effect. For instance, although Section 1983 is cited in the headings describing the two Counts, it is neither cited nor referenced in a single numbered paragraph of the Complaint. Nor does anything in the various briefs submitted in connection with the parties' cross-motions for summary judgment suggest Voter Appellants were seeking enforcement of the Materiality Provision by way of Section 1983. To the contrary, despite having multiple opportunities to do so, Voter Appellants never disputed that their right to relief was predicated on an implied private action under *Sandoval*'s framework. Indeed, far from drawing the distinction they now suggest is obvious, in their three briefs before the District Court, Voter Appellants only cited *Gonzaga* once, JA724 (table of authorities for Plaintiffs Memo. of Law in Opposition to Def. Mot.), JA752 (Plaintiffs' sole citation to *Gonzaga*)— and even then, treated its construct as conterminous with *Sandoval*.

Accordingly, Voter Appellants' argument that their right to seek relief should be examined under *Gonzaga*, rather than *Sandoval*, is waived. *See, e.g.*, *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster*

*Wheeler Energy Corp.*, 26 F.3d 375, 397-98 (3d Cir. 1994) (holding failure to meaningfully develop an argument constitutes waiver and that "a passing reference to an issue will not suffice to bring that issue before this court" (cleaned up)).

Moreover, to the extent this Court is inclined to deem these opaque references to Section 1983 and *Gonzaga* sufficient to preserve the issue for appeal, Voter Appellants' nevertheless lack a private right of action under that framework. Specifically, while Voter Appellants are correct that "where Congress has passed a law securing an individual right, 'the right is presumptively enforceable by § 1983[,]'" Appellants Br. at 21 (quoting *Gonzaga,* 536 U.S. at 284), rebutting that presumption is not the Herculean task Voter Appellants suggest. *See, e.g.*, *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120 (2005) (explaining "there is only a rebuttable presumption that the right is enforceable under § 1983" and holding the statute in question was not enforceable by private action). Rather, it requires an analysis that is largely indistinguishable from the second prong of *Sandoval*'s two-part test.

Specifically, just as "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others" in the context of an implied right of action, when enforcement is sought under Section 1983, "[t]he defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right." *City of Rancho Palos Verdes*, 544 U.S. at 120. Moreover, much like *Sandoval*, which requires examination of the statute's remedial scheme, "evidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Id.* Indeed, in *City of Rancho Palos*, which involved private enforcement of a concededly individual right through Section 1983, the Court quoted *Sandoval* in explaining that "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* (quoting *Sandoval*, 532 U.S. at 290). In short, therefore, the analysis of whether a private right of action exists to enforce the Materiality Provision is functionally identical here regardless of the theoretical avenue Voter Appellants choose. And, as

explained below, when that examination is conducted, this Court should have no difficulty in concluding that the question "is not a particularly close one." JA829 (opinion denying injunction pending appeal).

**(b) The District Court correctly concluded that the text and structure of the Materiality Provision precludes a private right of action.**

As a general matter, because only "'Congress creates federal causes of action,' where 'the text of a statute does not provide a cause of action, there ordinarily is no cause of action.'" *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 709 (3d Cir. 2020). In limited circumstances, however, an implied right of action may exist if, "a statute [manifests] Congress's intent to create (1) a personal right, and (2) a private remedy." *Three Rivers Ctr. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 421 (3d Cir. 2004). In discerning this intent, the inquiry must focus principally on the "the text and structure of the statute[.]" *Id.*; *see also McGovern v. City of Philadelphia*, 554 F.3d 114, 119 (3d Cir. 2009).

Examining Voter Appellants' statutory claim against this backdrop, the District Court's order should be affirmed, as the text and structure of the Materiality Provision does not confer a private remedy. Specifically, as the District Court recognized, Section 101 vests the

Attorney General with power to enforce the Materiality Provision. *See* 52 U.S.C. § 10101(c). While the Attorney General's enforcement authority is not made exclusive, a statute that provides for "agency enforcement creates ***a strong presumption*** against implied private rights of action that must be overcome." *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 305 (3d Cir. 2007) (emphasis added). This presumption is particularly difficult to overcome here because Section 101 not only vests the Attorney General with the power of enforcement, but also does so in substantial detail, describing the manner of instituting such proceedings, providing for continued judicial oversight, and setting forth the method for obtaining relief. Its omission of any reference to private enforcement, therefore, cannot be regarded as accidental.[8] In short, Congress's intent to vest the United States Attorney General with exclusive authority to enforce the Materiality Provision—thereby precluding a private right of action—is manifest from the text and structure of the Civil Rights Act.

Voter Appellants' arguments to the contrary do not withstand scrutiny. To begin, seizing on Subsection (d)—which vests the district

---

[8] *See* 52 U.S.C. § 10101(a), (c), (e) & (g).

courts with jurisdiction "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law[,]" 52 U.S.C. § 10101(d)—they maintain the reference to "aggrieved" parties and administrative exhaustion evinces clear Congressional intent to permit enforcement by individual plaintiffs, since the Attorney General cannot be considered an "aggrieved" party and is generally not subject to exhaustion principles. Appellants Br. at 27-28. There is, however, a much simpler, and much less conjectural, explanation for this provision: specifically, Subsection (f), which affords certain robust protections to "[a]ny person cited for an alleged contempt." 52 U.S.C. § 10101(f).

Voter Appellants also devote significant attention to the legislative history of Section 101.[9] Appellants Br. at 34-37. However, while the evolution of the Materiality Provision and the underlying intent may reflect Congressional intent to create and protect individual *rights*, they do not indicate an intent to create a private *remedy* for

---

[9] Voter Appellants also purport to discuss the statutory structure of Section 101, Appellants Br. at 31-33; the substance of their analysis, however, is devoted almost exclusively to the history and context of the statute, rather than its textual structure.

enforcement of those rights. To the contrary, the subsequent amendments to Section 101 conferring such power on the Attorney General and specifying a detailed enforcement process suggests the contrary. And, in any event, as *Sandoval* makes plain, the Supreme Court has "never accorded dispositive weight to context shorn of text," and such "legal context matters only to the extent it clarifies text." *Sandoval*, 532 U.S. at 288.

Finally, while this precise issue has not been squarely addressed by any court in this Circuit, the majority of courts, including the Sixth Circuit Court of Appeals have held that Section 101 does **not** provide for a private right action. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016) (examining the Materiality Provision and reaffirming its prior holding "that the negative implication of Congress's provision for enforcement by the Attorney General is that the statute does not permit private rights of action" (citing *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000)); *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004); *Spivey v. Ohio*, 999 F. Supp. 987, 996 (N.D. Ohio 1998); *Willing v. Lake Orion Community Sch. Bd. of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich.

1996); *Good v. Roy*, 459 F. Supp. 403, 405 (D. Kan. 1978); *McKay v. Altobello*, No. 96-cv-3458, 1996 WL 635987, at *2 (E.D. La. Oct. 31, 1996); *Cartagena v. Crew*, No. 96-cv-3399, 1996 WL 524394, at *3 n.8 (E.D.N.Y. Sept. 5, 1996).[10]

Furthermore, although the Eleventh Circuit Court of Appeals recognized a private right of action for such claims in *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003), that decision is predicated on authority that no longer holds any precedential value. Specifically, in allowing private parties to enforce the Materiality Provision, the *Schwier* panel relied upon *Allen v. State Board of Elections*, 393 U.S. 544 (1969), which—in the intervening years—has been expressly abrogated by the United States Supreme Court. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (explaining that "[i]n the mid–20th century, the Court followed a different approach to recognizing implied causes of action than it follows now[,]" and listing *Allen* among the cases from the "*ancien regime*" that have been abandoned by a series of decision,

---

[10] At least two other Courts have questioned, albeit in dicta, a party's standing to enforce Section 101 by private action. *See Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010); *Thrasher v. Illinois Republican Party*, No. 12-cv-4071, 2013 WL 442832, at *4 (C.D. Ill. Feb. 5, 2013).

including *Sandoval*). Indeed, even before *Ziglar*, this Court in

*McGovern* cautioned against reliance on pre-*Sandoval* Supreme Court

authority, since many of those decisions have been "'altered ... virtually

beyond recognition' by subsequent decisions of the Supreme Court."

*McGovern*, 554 F.3d at 118-19 (quoting *Wisniewski*, 510 F.3d at 299). As

such, to the extent *Schwier* recognizes a private right of action, it is

inconsistent with recent Supreme Court precedent.

In sum, consistent with the conclusion reached by the majority of

courts that have faced this issue, this Court should hold Voter

Appellants lack a private right of action.

> **2. Assuming *arguendo* a private right of action exists, Section 101 of the Civil Rights Act is wholly inapplicable and, in any event, does not prohibit states from requesting that an elector's voter declaration be accompanied by a dated signature.**

Even if this Court is inclined to proceed to the merits, Voter

Appellants are unable to state a claim for a violation of the Materiality

Provision because: (1) Section 101 prohibits discriminatory conduct—

specifically, racial discrimination, which Voter Appellants have neither

alleged nor established; (2) the Materiality Provision prohibits certain

conduct relative to voter registration, not ballot tabulation and

rejection; and (3) even if it is applicable, the Materiality Provision does not require the ballots in question to be canvassed, since a dated voter declaration accompanying a mail-in or absentee ballot is material to determining an elector's eligibility to vote and is otherwise part of an anti-fraud scheme.

> **(a)** **Section 101 of the Civil Rights Act is aimed at discriminatory conduct and, thus, is inapposite.**

Unlike other federal statutes—such as the Help America Vote Act—Section 101 is not a general regulation of state election laws; rather it is aimed specifically and exclusively at state election laws that illegally discriminate based on race. Turning, initially, to the plain language of Section 101, Subsection (a), which contains the Materiality Provision, is titled "[r]ace, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers; literacy tests[.]" 52 U.S.C. § 10101(a). The Materiality Provision's focus on racial discrimination comes into sharper focus, when considered against the broader statuary scheme. Specifically, it bears reiterating that Section 101 was enacted as part of the landmark 1964 Civil Rights Act, which sought to eliminate certain racially

discriminatory conduct by states. *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008). Accordingly, both the structure and history of the statute suggest Section 101 is limited to claims of racial discrimination.

Moreover, while sometimes disagreeing on its precise contours, federal courts appear to acknowledge that an allegation of discrimination—whether based on race or otherwise—is a prerequisite to applying Section 101. *Compare Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006); *Ballas v. Symm*, 351 F. Supp. 876, 889 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974); *Malinou v. Bd. of Elections*, 271 A.2d 798, 803 (R.I. 1970); *with*, *Ball v. Brown*, 450 F. Supp. 4, 7 (N.D. Ohio 1977); *Frazier v. Callicutt*, 383 F. Supp. 15 (N.D. Miss. 1974).

Here, Voter Appellants have not alleged in the Complaint, or in any of their briefing, that requiring a dated signature on a voter declaration is borne out of an *intent* to discriminate against a certain class of voters; nor has any discriminatory *impact* been alleged in the Complaint or elsewhere—let alone proven.

**(b)    The Materiality Provision is not implicated, since it applies exclusively to voter registration laws.**

The Materiality Provision pertains to voter registration applications and other similar papers or records—not, as Voter Appellants suggest, every conceivable submission related to the voting process.[11] As explained below, Voter Appellants' argument is predicated on a fundamental misunderstanding of the types of "records or papers" that fall within the ambit of the provision.

In this regard, because "[i]nterpretation of a word or phrase depends upon reading *the whole statutory text*, considering the purpose and *context* of the statute," *Dolan v. U.S. Postal Serv*., 546 U.S. 481, 486 (2006) (emphasis added), it is important to carefully examine the relevant passage in its entirety. Specifically, Section 101(a)(2)(B) prohibits denial of "the right of any individual to vote in any election because of an error or omission on ***any record or paper relating to***

---

[11] *See Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) ("[T]he statute forbids a person acting under color of law to disqualify a potential voter because of his or her failure to provide unnecessary information on a voting application."); *see also Thrasher*, 2013 WL 442832, at *3; *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1370-71 (S.D. Fla. 2004); *McKay v. Altobello*, 1996 WL 635987, at *1; *Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1995).

***any application, registration, or other act requisite to voting***,"

52 U.S.C. § 10101(a)(2)(B) (emphasis added), unless the error is

material in determining the individual's right to vote. While Voter

Appellants interpret the catchall term "other act requisite to voting"

broadly and without reference to the preceding words, under the

*ejusdem generis* principle of statutory construction, "where general

words follow specific words in a statutory enumeration, the general

words are construed to embrace only objects similar in nature to those

objects enumerated by the preceding specific words." *Off. Comm. of*

*Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.*

*Chinery*, 330 F.3d 548, 562 (3d Cir. 2003) (quoting *Circuit City Stores,*

*Inc. v. Adams*, 532 U.S. 105, 114-15 (2001)); *see also Singh v. Uber*

*Techs. Inc.*, 939 F.3d 210, 220 n.3 (3d Cir. 2019) ("[W]hen a statute sets

out a series of specific items ending with a general term, [the] general

term is confined to covering subjects comparable to the specifics it

follows." (quoting *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576,

586 (2008)). Furthermore, Section 101's use of the phrase "other" makes

the application of this precept to the present statute particularly apt

because it confirms Congress's intent to refer back to the preceding

series of words. *Accord Maier v. Patterson*, 511 F. Supp. 436, 444 (E.D. Pa. 1981) ("By the principle of *ejusdem generis*, the general expression 'otherwise disciplined' connotes action similar to the specific acts of fining, suspending, or expelling."). Accordingly, properly understood, the Materiality Provision prohibits denial of an individual's right to vote based on mistakes on records or papers that are related to applications, registrations, or other acts requisite to voting that are similar to applications or registrations.[12]

Against this backdrop, Voter Appellants' claim lacks merit, since a voter declaration accompanying a completed mail-in ballot is in no way similar to an application or registration paper. And to the extent Voter Appellants rely on the broad definition of the term "vote" in Section 101(e), 52 U.S.C. §§ 10101(a)(3)(A) & (e), to avoid this conclusion, that argument is unsustainable because it would lead to a circular and

---

[12] The doctrine of *ejusdem generis* is a critical tool of statutory construction, as it seeks to reconcile several competing principles of interpretation—namely that: (1) all words in a statute are to be given effect, if possible; (2) all parts of a statute are to be construed together; and (3) and that the legislature should not be presumed to have used superfluous language. *See Ejusdem generis*, 2A Sutherland Statutory Construction § 47:17 (7th ed.) (collecting cases).

meaningless statutory construct. Indeed, Voter Appellants' proposed formulation would result in a tautology, whereby the phrase "other act requisite to voting[,]" 52 U.S.C. § 10101(a)(2)(B), would mean any "action required by State law prerequisite to voting[.]" 52 U.S.C. § 10101(e). Such a reading is unintelligible and confuses, rather than clarifies, the statutory meaning.

> **(c)** **Even if applicable, Section 101 is not violated by requiring voters to furnish a dated signature on their voter declaration.**

In the event this Court is inclined to apply Section 101, requiring electors to date their voter declaration *is material* to determining their qualifications and is otherwise part of the State's anti-fraud scheme. Thus, the Election Code's mandate is consistent with Federal law.

At the outset, it is important to reiterate that the dating requirement Voter Appellants challenge does not apply to ***a ballot*** as such, but rather, ***a signed voter declaration***, attesting (on pain of criminal penalty, *see* 25 P.S. § 3553), that the elector, *inter alia*, (1) is qualified to vote from the stated address; (2) has not already voted in the election; and (3) is qualified to vote the enclosed ballot. *See In re Canvass*, 241 A.3d at 1065 (citing 25 P.S. § 3150.14). As developed

below, the specific date on which any one of these three representations are made is material in determining whether an individual is qualified under Pennsylvania law to vote. Each of the three representations made on a voter declaration are addressed *seriatim*.

Turning, initially, to the first attestation on the declaration, under the Election Code, a person is qualified to vote "in the election district where he or she ... offer[s] to vote" if "[h]e or she shall have resided" there at least thirty days immediately preceding the election. 25 P.S. § 2811. Residence, under the Election Code, does not depend on mere registration status; rather, it "means the place where the elector makes his permanent or true home, his principal place of business, and his family residence, if he have one.'" *In re Stabile*, 36 A.2d 451, 453 (Pa. 1944) (quoting *Case of Fry*, 71 Pa. 302, 307 (1872)). It is self-evident, therefore, that whether a person resides at a specific address—and, therefore, is qualified to vote from there—may change in a matter of days. And the truthfulness of an elector's representation in this regard may change based on the date on which it is made.

To illustrate, consider a hypothetical voter who received a mail-in ballot forty-five days before the 2021 general election, which was the

latest point at which each county **_had to_** commence delivery of such ballots, *see* 25 P.S. § 2811, but on October 3, 2021 discovered that he had to unexpectedly relocate to a different state and on October 19, 2021 (two weeks before the election) completed his move. If the voter signed the voter declaration on October 1, 2021, he truthfully attested to being a qualified voter and, indeed, would have had no reason to know that his residence would change. However, if the voter signed the voter declaration on October 20, 2021, he plainly made a false representation and is guilty of fraud. Absent a dated declaration, under such circumstances, whether the elector had been truthful would be difficult, if not impossible to establish.

Similarly, an elector's representation that he has not yet voted in the election may be true or false depending on the date on which the attestation is made, which does not require a hypothetical to imagine.

As for the general representation that the elector is qualified to vote the enclosed ballot, in addition to relocation, other factors also bearing on an individual's qualification to vote can change with time. Consider a hypothetical elector who had been charged with a felony, but was not convicted until October 25, 2021. If that voter's absentee ballot

voter declaration was signed at any point before October 25, 2021, the elector had been entirely truthful in representing himself as a qualified voter. *See Voting by Untried Prisoners and Misdemeanants*, 67 Pa. D. & C.2d 449 (Op. Pa. Atty. Gen. 1974). If, however, he signed the declaration after that date, the attestation was false, since a convicted felon is not qualified to vote under the Election Code. *See* 25 P.S. § 2602(w) (excluding incarcerated felons from the statutory definition of "qualified absentee elector"); *Mixon v. Commonwealth*, 759 A.2d 442, 450 (Pa. Cmwlth. 2000), *aff'd*, 783 A.2d 763 (Pa. 2001).

In short, a dated voter declaration is, in fact, material to determining whether an elector has the right to have his or her ballot canvassed; *i.e.*, whether the elector is "qualified to vote." That was the conclusion reached by the Pennsylvania Supreme Court, as reiterated by the Commonwealth Court in the State Court proceedings.[13] These decisions, while not binding on this Court, further elucidate and confirm the materiality of a dated voter declaration. *See Martin v. Crittenden*,

---

[13] *See Ritter v. Lehigh Cty. Bd. of Elections*, No. 1322 C.D. 2021, 2022 WL 16577, at *4 (Pa. Cmwlth. Jan. 3, 2022); *In re Canvass*, 241 A.3d at 1090-91 (Dougherty, J., concurring and dissenting); *see also id.* at 1087 (Wecht, J., concurring and dissenting).

347 F. Supp. 3d 1302, 1309 (N.D. Ga. 2018) ("This Court's conclusion that year of birth information on the absentee ballot envelope is immaterial is only strengthened by the Georgia Supreme Court's explicit recognition that Georgia law 'does not mandate the automatic rejection of any absentee ballot lacking the elector's place and/or date of birth.' (quoting *Jones v. Jessup*, 615 S.E.2d 529, 531 n.5 (Ga. 2005))).[14] Voter Appellants, for their part, fail to advance any cogent argument that would undermine this conclusion.

---

[14] Voter Appellants suggest *Martin* somehow aids their claim. But as a closer examination of *Martin* demonstrates Voter Appellants' reliance is misplaced. Specifically, that case dealt with a Georgia statute that required absentee and mail-in voters, whose qualification to vote had already been established, to include a handwritten date of birth on the envelope in which their ballots were enclosed. Unlike the date on which a signature is affixed, however, an elector's date of birth does not change and cannot be used in assessing the veracity of a representation made on a declaration. Moreover, in holding a date of birth was immaterial, the *Martin* Court attached significance to two facts not present here: *first*, "the Georgia Supreme Court's explicit recognition that Georgia law does not mandate the automatic rejection of any absentee ballot lacking the elector's place and/or date of birth[;]" *Martin*, 347 F. Supp. at 1309 (internal quotation marks and citations omitted); and *second*, the fact that rejection of such ballots was not a uniformly-adopted practice among the counties. *See id.* Here, the Pennsylvania State Supreme Court has held Pennsylvania law ***does*** "mandate the automatic rejection of any absentee [or mail-in] ballot lacking" a dated signature on the accompanying voter declaration. *Id.* In addition, there is no evidence that any county—at least since November 2021—has ignored this clear statutory mandate.

Moreover, in addition to its materiality in determining an elector's right to have his or her ballot canvassed in the specific election for which the ballot is offered (*i.e.*, whether the elector is "qualified to vote"), a dated voter declaration is also material in determining an elector's qualification to vote in ***future*** elections. Specifically, under the Election Code, any person who signs a voter declaration "knowing any matter declared therein to be false," 25 P.S. § 3553, is not only guilty of a misdemeanor, but is also automatically "deprived of the right of suffrage absolutely for a term of four years from the date of his conviction[.]" 25 P.S. § 3552; *Com. v. Petrillo*, 386 A.2d 590, 593 (Pa. Super. 1978). As the above examples illustrate, the date on which an attestation is made is material—indeed, arguably determinative—in establishing whether an individual who is not qualified to vote has ***knowingly*** made a false representation, such that he is guilty of a criminal offense and must be disqualified from voting for four years, or merely acted carelessly in failing to inform the board of elections of the change in circumstances. *See generally Com. v. Bobbino*, 18 A.2d 458, 460 (Pa. Super. 1941) (mere carelessness in ascertaining one's own qualification to vote is insufficient to demonstrate that an individual

who was not qualified to vote acted knowingly in casting a ballot). Accordingly, a dated voter declaration is material to determining a voter's qualification to vote in both present and future elections.

Finally, as the above rendition shows, requiring a dated voter declaration also serves a significant fraud-deterrent function, which, in of itself, satisfies Section 101's materiality requirement.[15] *See Howlette v. City of Richmond, Va.*, 485 F. Supp. 17, 22-23 (E.D. Va. 1978) (holding a statute requiring each signature on a referendum petition to be notarized does not violate the Materiality Provision), *aff'd*, 580 F.2d 704 (4th Cir. 1978). Like the statutory mandate in *Howlette*, requiring voters to submit a dated voter declaration along with their mail-in or absentee ballot "impresses upon the signers of the [declaration] the seriousness of the act of signing" a declaration and "dissuades non-qualified persons" from voting "by subjecting those who take the oath to potential criminal liability for perjury because of their fraud-deterrent function." *Id.* Accordingly, aside from the materiality of a dated voter

---

[15] Critically, the District Court analyzed the anti-fraud components of the dated voter declaration requirement in the context of examining Plaintiffs' constitutional claim in Count II. JA31-33 (District Court Opinion). Voter Appellants did not appeal the District Court's finding or analysis as to Count II. Appellants Br. at 13 n.3.

declaration in ascertaining a elector's qualification to vote, the statute's safeguard against fraud is, without more, sufficient to overcome any challenge under Section 101.

Accordingly, no violation of Section 101 exists.

## C. The Court lacks subject matter jurisdiction over all of Voter Appellants' claims, since they lack Article III standing for every item of relief they seek.

Voter Appellants—who number just 5 of the 257 electors at issue—ask the Court to permanently enjoin the Board from certifying the outstanding election results without "canvassing those mail ballots that have been set aside solely because the outer return envelope does not include a date." Appellants Br. at 53-54. In other words, Voter Appellants seek remedy for an injury to the 252 other parties not before the Court. This is critical because those other electors are fundamentally different from Voter Appellants in two ways: (1) they chose, through inaction, not to pursue relief for their alleged personal injuries; and (2) whether the ballots of those 252 electors can be "canvass[ed]" as a matter of law is uncertain, since whether they complied with the Election Code in other material ways is unknown.

To illuminate all of the foregoing, as a preliminary matter, since Article III standing goes to jurisdiction, it can be raised at any time, even on appeal for the first time. *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003).

Article III standing, in its simplest form, requires a three-part showing: (1) injury-in-fact, (2) traceability, and (3) redressability. *See Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016). This Court has observed that "courts typically only allow a party to raise his own rights rather than the rights of others …." *Contractors Ass'n of E. Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 996 (3d Cir. 1993). It further explained "[t]his doctrine sensibly enables a court to 'avoid[ ] … adjudication of rights which those not before the court may not wish to assert, and assur[es] that the most effective advocate of the rights at issue is present to champion them[.]'" *Id.* (quoting *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 80 (1978)). Critically for present purposes, "[a] plaintiff seeking relief must show he or she has standing *for each remedy sought*." *Freedom from Religion Found.*, 832 F.3d at

480 (emphasis added) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).

As noted above, Voter Appellants lack standing for the all-inclusive relief they seek for two reasons.

*First*, even under Voter Appellants' own explanation of the Materiality Provision, the law creates "a personal, individual right" or "an individual right and an individual remedy," and **none** of the other 252 electors has pursued their own injury to these personal, individual rights. *See* Appellants Br. at 14, 15, 22; *see also id.* at 19. As is well-established, various personal rights—even fundamental ones—can be waived. *See, e.g.*, *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."); *U.S. v. Brown*, 849 F.3d 87, 91 (3d Cir. 2017) (describing circumstances under which criminal defendant can waive fundamental constitutional rights). Here, the 252 electors have elected not to pursue the individual rights purportedly afforded under the Materiality Provision by not *personally* pursuing them though filing suit, either independently or alongside Voter Appellants.

At this point, given the laches implication of this choice, this inaction is a permanent waiver of any related rights. *See supra* (laches argument).[16]

Moreover, Voter Appellants have articulated no reason why, as a standing matter, they should be deemed to have the ability to pursue relief for the injury to the personal rights of others. Indeed, these 252 other electors are fully known to Voter Appellants by name, address, party registration, and age, JA169 at ¶ 25 (Stip. Facts), yet Voter Appellants have created no record to show why those *known and identifiable* electors could not be joined as party-plaintiffs or could not pursue their own personal suits. Nor did Voter Appellants seek class certification. *See generally* Fed.R.Civ.P. 23. In consequence, Voter Appellants have no standing to pursue all of the relief they seek

---

[16] What is more, the inaction by these other 252 electors may well be more purposeful than can be known, since the record reveals the Board cancelled all of the undated voter declaration ballots before election day and attempted to send notice to those impacted by email, where known. JA169 at ¶¶ 27-29 (Stip. Facts). Thus, the other 252 electors may well have received this notice and *actively* elected to forgo the rights it triggered: either to cure or to go to court to claim a violation of the Materiality Provision. All of this is entirely unknown about them, however, which is precisely why Voter Appellants cannot pursue a remedy for a purported violation of these other electors' personal, *waivable* rights.

because it depends in large part on injuries to others, and, in turn, this Court lacks jurisdiction over the overly broad remedy sought.

*Second*, Voter Appellants are not similarly situated, factually or legally, as the other 252 electors upon whose behalf they seek relief, and thus they are without standing to seek the exact relief sought: *canvassing* of all 257 undated ballots. *See* Appellants Br. at 53-54. Starting with the factual difference, while all 257 ballots suffer the same defect—a signed but undated voter declaration—they are *not* similarly situated in another key respect, at least based on the present record. That respect is whether the other 252 electors, like the five Voter Appellants, also complied with the Pennsylvania Election Code's obligation to place the marked ballot in the secrecy envelope. Here, all five Voter Appellants specifically averred, and all parties stipulated to the averment, that they complied with the secrecy envelope requirement. JA172 at ¶ 57; JA173 at ¶ 65; JA173 at ¶ 72; JA174 at ¶ 82; JA175 at ¶ 89 (Stip. Facts). That averment is critical since, as a matter of Pennsylvania law, mail-in or absentee ballots received without the secrecy envelope (described in caselaw as "naked ballots") cannot be canvassed. *See Pennsylvania Democratic Party v. Boockvar*,

238 A.3d 345, 380 (Pa. 2020) ("Accordingly, we hold that the secrecy provision language in Section 3150.16(a) is mandatory and the mail-in elector's failure to comply with such requisite by enclosing the ballot in the secrecy envelope renders the ballot invalid."). This is the case not only because of the mandatory language in the Election Code, but also because of the Pennsylvania Constitution's guarantee of secrecy in voting. *See id.* at 379 (citing Pa. Const. art. VII, § 4 ("All elections by the citizens shall be by ballot or such other method as may be prescribed by law; Provided, That secrecy in voting be preserved.")).

And this factual deficit in the record regarding the other 252 electors directly impacts the legal remedy Voter Appellants ask this Court to enter. As noted, Voter Appellants ask this Court for a permanent injunction requiring the "canvassing" of all 257 ballots. *See* Appellants Br. at 53-54. The "canvassing" of ballots under Pennsylvania law is a term of art. In fact, the word "canvass" is defined as follows: "The word 'canvass' shall mean the gathering of ballots after the final pre-canvass meeting **and the counting**, computing and tallying of the votes reflected on the ballots." 25 P.S. § 2602 (emphasis added); *see also* 25 P.S. § 3146.8(g) (describing specific process for canvassing mail-in

and absentee ballots). In other words, the canvassing injunction Voter Appellants ask to be imposed upon the Board would, by this Court's order, require the Board to ignore any "naked ballots" and count the same as part of the final election tally, despite those ballots being invalid under Pennsylvania law for reasons separate and apart from any dated declaration defect.

Yet no factual record exists before this Court to support a Federal order requiring State officials to defy State law, where the State law at issue was never challenged. And critically, the "naked ballot" issue was never addressed because the five Voter Appellants created a factual record that this issue did not apply to them, yet they never created a similar factual record—presumably because they could not—as to the other 252 electors. Hence, this Court has no way to determine whether those non-participating electors can have their ballots "canvassed," despite Voter Appellants' demand that the Court order just that. This Court recently cautioned against overly broad injunctions where the facts in each case may well vary, warranting differing treatment. *See Free Speech Coalition, Inc. v. Att'y Gen. United States*, 974 F.3d 408, 430 (3d Cir. 2020) (limiting "nationwide injunction" to just plaintiffs,

and not all others with alleged similar claims, where circumstances of others' claims may be different); *see also Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (vacating injunction as "too broad" and ordering injunction limited to just individual plaintiffs absent class certification). That logic applies with equal force here to demonstrate Voter Appellants do not have standing to pursue all of relief they seek.

In summary, because Voter Appellants do not have standing for every item of relief they seek, this Court lacks subject matter jurisdiction in material part. Hence, even if the Court agrees with Voter Appellants on the merits of their Materiality Provision claim (and if the Court rejects the laches argument above), the most relief this Court could afford is an order compelling the counting of Voter Appellants' five ballots, and no others.

## VI.   CONCLUSION

Ritter respectfully requests that this Court affirm the summary judgment order of the District Court.

Respectfully submitted,

Dated: April 8, 2022

/s/ Joshua J. Voss
Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Eml: jvoss@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com

*Attorneys for David Ritter*

# COMBINED CERTIFICATIONS

## Certificate of Compliance

This brief complies with the length limitation of Federal Rule of Appellate Procedure 32(a)(7) because the brief contains 12,811 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface in Microsoft Word using 14-point Century Schoolbook font.

## Electronic Document Certificate

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the forthcoming paper copies.

The brief was scanned for viruses using CrowdStrike Falcon, version 6.29.14304.0, and no viruses were detected.

## Certificate of Bar Admission

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I certify that I am a member of the bar of the United States Court of Appeals for the Third Circuit.

## Certificate of Service

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on the date set forth below. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 8, 2022    /s/ Joshua J. Voss
                        Joshua J. Voss (No. 306853)
                        KLEINBARD LLC
                        Three Logan Square
                        1717 Arch Street, 5th Floor
                        Philadelphia, PA 19103
                        Ph: (215) 568-2000
                        Fax: (215) 568-0140
                        Eml: jvoss@kleinbard.com

                        *Attorney for David Ritter*