# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 22-1499

MS. LINDA MIGLIORI; FRANCIS J. FOX; RICHARD E. RICHARDS; KENNETH RINGER; SERGIO RIVAS,
APPELLANTS

ZACHARY COHEN,
INTERVENOR

v.

LEHIGH COUNTY BOARD OF ELECTIONS

DAVID RITTER,
INTERVENOR

Nos. 25-2650 & 25-2761

MS. LINDA MIGLIORI; FRANCIS J. FOX; RICHARD E. RICHARDS; KENNETH RINGER; SERGIO RIVAS,
APPELLANTS IN NO. 25-2761

v.

LEHIGH COUNTY BOARD OF ELECTIONS
APPELLANT IN NO. 25-2650

---

Appeal from the U.S. District Court, E.D. Pa.
Judge Joseph F. Leeson, Jr. and Judge Jeffrey L. Schmehl
No. 5:22-cv-00397

Before: SHWARTZ, MATEY, and MCKEE, *Circuit Judges*
Submitted: March 9, 2026; Filed: Oct. 29, 2026

---

NONPRECEDENTIAL OPINION*

MCKEE, *Circuit Judge*.

This is a cross-appeal of an order granting in part and denying in part a motion for attorneys' fees brought by Linda Migliori, Francis J. Fox, Richard E. Richards, Kenneth Ringer, and Sergio Rivas (collectively, "Plaintiff Voters"). The question before us is whether Plaintiff Voters are a "prevailing party" pursuant to 42 U.S.C. § 1988, and if so, whether the attorneys' fees awarded by the District Court are reasonable. For the reasons that follow, we will affirm.[1]

**I.**

The Lehigh County Board of Elections challenges the District Court's finding that Plaintiff Voters are a "prevailing party" under 42 U.S.C. § 1988. "We exercise plenary review over legal issues relating to the appropriate standard under which to evaluate an application for attorney's fees," including whether Plaintiff Voters are a prevailing party.[2]

In its well-reasoned and thorough opinion, the District Court explained why Plaintiff Voters are the prevailing party, and why no special circumstances exist rendering an award of attorneys' fees unjust.[3] We will affirm the District Court's rulings substantially for the reasons set forth in the Court's opinion.

---

* This is not an opinion of the full Court and, under 3d Cir. IOP 5.7, is not binding precedent.

[1] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over the appeal and cross-appeal pursuant to 28 U.S.C. § 1291.

[2] *Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 163 (3d Cir. 2002).

[3] *Migliori v. Lehigh Cnty. Bd. of Elections*, 668 F. Supp. 3d 337, 345–49 (E.D. Pa. 2023).

## II.

Based upon its conclusion that the Plaintiff Voters were the prevailing party, the District Court awarded them attorneys' fees. However, the Court reduced the amount of fees awarded under § 1988, and Plaintiff Voters now argue that this reduction in fees was inappropriate. "We review the reasonableness of an award of attorney's fees for an abuse of discretion."[4]

First, Plaintiff Voters challenge the District Court's reduction of the number of hours worked. Specifically, they argue that (1) the Board's objections were not sufficiently specific, and (2) the District Court erred by reducing the number of hours worked based on grounds not raised by the Board.

In *Bell v. United Princeton Properties, Inc.*, we held that a party challenging a fee request must "submit briefs that identify the portion of the fee request being challenged and state the grounds for the challenge with sufficient specificity to give the fee applicants notice that they must defend the contested portion of their fee petition."[5] Here, the Board's objections generally identified the type of work being challenged and stated the grounds for contending that the hours claimed in that area are unreasonable. Specifically, it listed the hours and activities that it felt were unreasonable. The Board's objections were sufficiently specific to satisfy the *Bell* standard.

---

[4] *Rode v. Dellarciprete*, 892 F.2d 1177, 1182 (3d Cir. 1990).

[5] *Bell v. United Princeton Props., Inc.*, 884 F.2d 713, 715 (3d Cir. 1989). The submission "must be clear in two respects[:] First, [it] must generally identify the type of work being challenged, and second, [it] must specifically state the adverse party's grounds for contending that the hours claimed in that area are unreasonable." *Id.* at 720.

Plaintiff Voters argue that even if the Board's objections were legally sufficient, the District Court erred by reducing the requested fee award "based on grounds not actually raised by the Board."[6] However, "the district court retains a great deal of discretion in deciding what a reasonable fee award is, so long as any reduction is based on objections actually raised by the adverse party."[7] "[I]n setting the amount of any reduction, the court will inevitably be required to engage in a fair amount of 'judgment calling' based upon its experience with the case and its general experience as to how much time a case requires."[8] Thus, to fairly exercise its discretion, "a district court needs flexibility in deciding whether to reduce a fee request and, if so, by how much."[9]

Here, the District Court drew upon its "general experience as to how much time a case requires" to reduce the requested hours of work in certain categories.[10] It explained why it found certain hours expended on each task excessive in light of the task itself, the number of attorneys working on it, and the attorneys' level of experience. Accordingly, the District Court's reduction in hours was adequately supported by the court's factual findings and well within its discretion.

Next, Plaintiff Voters argue that the District Court erred in defining the relevant market as Allentown, instead of the Eastern District of Pennsylvania, and reducing the

---

[6] Second Step Br. 37.
[7] *Bell*, 884 F.2d at 721.
[8] *Id.*
[9] *Id.*
[10] *Id.*

hourly rates for certain attorneys. "The determination of the appropriate billing rate is a factual finding which we review for clear error."[11]

Here, the Court explained that the Eastern District of Pennsylvania has vicinages in Allentown, Reading, Easton, and Philadelphia, each of which contain different legal markets with different attorney rates. Because the suit was filed and litigated in EDPA-Allentown, the court concluded that the relevant community for purposes of determining a reasonable hourly rate is Allentown. As for the hourly rates, we find that the court appropriately relied on the CLS fee schedule, which both Plaintiff Voters and the Board relied on in affidavits submitted to the court, to determine the reasonable hourly rate for such attorneys. We discern no clear error in the District Court's determinations. For the same reasons, we adopt the recommendation to award fees for work performed in connection with the merits appeal.[12]

Finally, Plaintiff Voters argue that the District Court erred in denying their request for attorneys' fees for litigating the fee petition. While a prevailing party can sometimes be awarded fees incurred arising from filing a fee petition, the propriety of such fees is subject to a separate lodestar analysis.[13] Plaintiff Voters did not submit the necessary lodestar analysis, despite being on notice that briefing would be complete after they filed their

---

[11] *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 709 (3d Cir. 2005), *as amended* (Nov. 10, 2005).
[12] *Migliori v. Lehigh Cnty. Bd. of Elections*, 2025 WL 2493838, at *1 (E.D. Pa. July 31, 2025).
[13] *See Rode*, 892 F.2d at 1192.

supplemental briefing. Because Plaintiffs submitted no supporting documentation, the District Court did not err in denying the request for fees for litigating the fee petition.

* * * * *

For the foregoing reasons, we will AFFIRM.[14]

[14] We appreciate the depth of the background and explanation offered by the Dissent. However, because this opinion is nonprecedential and intended only to address the District Court's resolution of the fee petition and for the parties who are very familiar with the issues and background of this dispute, we need not respond in kind to the points raised by our dissenting colleague.

MATEY, *Circuit Judge*, dissenting.

In 2022, I joined the majority in ruling that Linda Migliori and the four other Plaintiffs could bring this action because appellee Lehigh County Board of Elections and intervenor David Ritter "did not challenge the argument that [52 U.S.C.] § 10101(a)(2)(B) [the "Materiality Provision"] creates an individual federal right. At all." *Migliori v. Cohen*, 36 F.4th 153, 165 (3d Cir. 2022) (Matey, J., concurring in the judgment) (footnotes omitted). They also offered "little argument[ ] that the date requirement for voter declarations . . . is material." *Id.* Because Ritter and the LCBE had "explained no material issues left for litigation," I reluctantly concurred only in the judgment as a matter of party presentation. *Id.* at 166. But Ritter has now revised his arguments in later proceedings before the Supreme Court, and those newly raised points lead to a different outcome: there is not now, nor was there ever, a cause of action for the Plaintiffs under 52 U.S.C. § 10101(a)(2)(B).

I also write separately because I disagree that the Plaintiffs are entitled to an award of attorney's fees, as their abuse of the civil rights fee-shifting mechanism constitutes a special circumstance that should preclude their recovery. Finally, and with respect to the difficult circumstances faced by the trial judge, who ably labored through the shifting sands of issues and advocates, I would also find that the District Court abused its discretion by failing to recognize the limited degree of relief that the Plaintiffs obtained. For all those reasons, I would vacate the judgment and remand.

# I.

First, a refresher on the case. Pennsylvania's election code currently requires that mail-in ballot envelopes be signed and dated. 25 Pa. Stat. §§ 3146.6(a), 3150.16(a). Migliori and the other Plaintiffs did not date their envelopes for a 2021 judicial election, so the LCBE discarded their ballots. *Cohen*, 36 F.4th at 158. They sued under 42 U.S.C. § 1983, arguing that the LCBE's decision to exclude their ballots violated 52 U.S.C. § 10101(a)(2)(B). *Id.* at 158–59. Ritter, one of the candidates in the election, intervened to support the LCBE. *See id.* at 158. The District Court ruled that there was no private right of action to enforce Section 10101(a)(2)(B), and the Plaintiffs appealed. *Id.* Since a federal statute that unambiguously confers a private right presumptively has a private remedy under Section 1983, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002), our analysis proceeded in three steps: First, was a private right conveyed? Second, was that right privately enforceable under Section 1983? And third, if the Materiality Provision is privately enforceable, was it violated by Pennsylvania's ballot dating requirement?

At step one, neither Ritter nor the LCBE challenged the District Court's conclusion that Section 10101(a)(2)(B) created a "personal right," so we did not disturb that decision. *Cohen*, 36 F.4th at 159; *id.* at 165 n.2 (Matey, J., concurring in the judgment). At step two, we ruled that Ritter and the LCBE failed to overcome the presumption that Section 1983 could vindicate this private right. *Id.* at 159–62 (majority opinion). And finally, at step three, we ruled that the Materiality Provision of Section 10101(a)(2)(B) was violated, because Ritter and the LCBE offered no meaningful arguments explaining how the ballot dating requirement is material to determining a

voter's qualification to cast a ballot. *Id.* at 162–64. In particular, we observed that the LCBE acknowledged that it was counting ballots with incorrect dates and only setting aside ballots with no date at all, so we found it "hard to understand how one could claim that this requirement has any use in determining a voter's qualifications." *Id.* at 164. So we "remand[ed] this matter to the District Court and direct[ed] that Court to enter an order that the undated ballots be counted." *Id.*

Without the undated ballots, candidate Ritter would have won the election; with the panel's order to count them, he would lose. Rather than seek rehearing before our full court, Ritter petitioned the Supreme Court for a stay. Emergency Application for Stay, *Ritter v. Migliori*, No. 21A772 (May 27, 2022), 2022 WL 2704505. That application ushered in a sea of new arguments. First, Ritter no longer conceded that Section 10101(a)(2)(B) permits a private right of action. *Id.* at *16–20.[1] Second, Ritter restructured his approach to arguing that the Materiality Provision was not violated. Rather than aver that the dating requirement was material to determining voter qualifications, he argued that it determined *ballot validity*, so that "materiality" was irrelevant as the Materiality Provision was not implicated at all. *See id.* at *12. As now framed, Ritter explained that "[v]oters who are qualified to vote, but whose votes are not counted because they failed to follow the state-law procedures for casting a valid ballot, . . . . have not been 'den[ied] the right' to vote; they were given that right but failed to cast their ballot properly." *Id.* at *12–13 (last alteration in original). Since voter

[1] Ritter did not argue that the Materiality Provision does *not* convey an individual right—rather, he no longer seems to stake a position on this issue.

qualifications were not involved, he argued that the Plaintiffs could not seek relief under the Materiality Provision, which only regulates government action that may "deny the right of any individual to *vote*." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

With the benefit of these new arguments, the Supreme Court issued a temporary stay. *Ritter v. Migliori*, 213 L. Ed. 2d 1013 (May 31, 2022), *vacated*, 142 S. Ct. 1824 (Mem.) (June 9, 2022). The Court vacated it nine days later, but Justice Alito, joined by Justices Thomas and Gorsuch, dissented, agreeing with Ritter's new argument that "[w]hen a mail-in ballot is not counted because it was not filled out correctly, the voter is not denied 'the right to vote.' Rather, that individual's vote is not counted because he or she did not follow the rules for casting a ballot." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from denial of stay). "There is no reason why the requirements that must be met in order to register (and thus be 'qualified') to vote should be the same as the requirements that must be met in order to cast a ballot that will be counted. Indeed, it would be silly to think otherwise." *Id.* So Justice Alito found it "very likely incorrect" that the Materiality Provision was violated by Pennsylvania's ballot dating requirement. *Id.* at 1826.

After the denial of the stay, the LCBE certified the election and declared Ritter's opponent the winner, but Ritter still petitioned for certiorari. Petition for Writ of Certiorari, *Ritter v. Migliori*, No. 22-30 (July 7, 2022), 2022 WL 2704768. He asserted that our decision should be vacated because the case was now moot, *id.* at *4, but reiterated his fresh argument that "rules governing the validity of mail-in ballots—the where, when, and how of casting these ballots—do not have 'anything to do' with a

voter's qualifications," *id.* at *18. The Supreme Court agreed that the case was moot, vacated the panel judgment, and remanded with instructions to dismiss. *Ritter v. Migliori*, 143 S. Ct. 297, 298 (Mem.) (Oct. 11, 2022). This fee petition followed.

**II.**

To recap, Ritter changed his position in two ways before the Supreme Court. First, he no longer conceded that the Materiality Provision creates private rights. And second, he argued that the Plaintiffs could not show a violation of the Materiality Provision because the ballot dating law concerns ballot validity, not voter qualifications. I address each and, considering these transformed theories, conclude that Ritter is correct.

**A.**

**1.**

The panel did not explore whether the Materiality Provision creates a private right, merely agreeing with the parties, who did not dispute this issue on appeal. *Cohen*, 36 F.4th at 159; *id.* at 165 n.2 (Matey, J., concurring in the judgment). Some federal election laws certainly do, like the National Voter Registration Act of 1993—the so-called "Motor Voter" law—which allows "[any] person who is aggrieved by a violation of [the Act]" to "bring a civil action in an appropriate district court for declaratory or injunctive relief." 52 U.S.C. § 20510(b). And even today, Congress sometimes turns to express public enforcement mechanisms. *See, e.g.*, SAVE America Act, S. 1383, 119th Cong. § 2(i) (as passed by House, Feb. 11, 2026) (amending Motor Voter law to allow aggrieved persons to bring cause of action against "an election official who registers an applicant to vote in an election for Federal office who fails to present documentary proof of United States

citizenship”). But the Materiality Provision includes no private right of action. The law only provides that “the Attorney General may institute for the United States . . . a civil action or other proper proceeding for preventive relief.” 52 U.S.C. § 10101(c). So we must determine whether there is an individual right conveyed by the Materiality Provision that may be enforced by Section 1983.

As I explained in my 2022 concurrence, circuit precedent holds that “a statute creates a personal right when it satisfies all three of [the] factors” in *Blessing v. Freestone*, 520 U.S. 329 (1997). *Cohen*, 36 F.4th at 165 n.1 (Matey, J., concurring in the judgment). But those old decisions are out of step with current law: the Supreme Court has clarified that courts “should not” refer to “*Blessing* when asking whether a . . . statute creates an enforceable individual right,” as *Gonzaga* “‘reject[ed]’ any reading of [its] prior cases that would ‘permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983.’” *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 376 (2025) (first alteration in original) (quoting *Gonzaga*, 536 U.S. at 283). Now, “[t]o the extent lower courts feel obliged, or permitted, to consider . . . *Blessing*, they should resist the impulse.” *Id.*[2]

[2] The Court’s repudiation of *Blessing* was apparent by 2023. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (“*Gonzaga* sets forth our established method for ascertaining unambiguous conferral.”); *id.* at 230 (Alito, J., dissenting) (characterizing *Gonzaga* as “rejecting the standard articulated in *Blessing v. Freestone*”).

But we persisted in following that impulse,[3] and we should revisit our reliance on *Blessing* because under *Gonzaga*, the Materiality Provision does not convey a private right.[4] Claimants seeking to assert a private cause of action "must show, at a minimum, that [the statute] does not just seek to benefit them or serve their interests but 'clear[ly] and unambiguous[ly]' gives them individual federal rights." *Medina*, 606 U.S. at 376 (last two alterations in original) (quoting *Gonzaga*, 536 U.S. at 290). Moreover, "the provision in question [must be] '"phrased in terms of the persons benefited"' and contain[ ] 'rights-creating,' individual-centric language." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (quoting *Gonzaga*, 536 U.S. at 284, 287). The Supreme Court "reject[s] § 1983 enforceability where the statutory provision 'contain[s] no rights-creating language'[ or] ha[s] 'an aggregate, not individual, focus.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 290). Here, the Materiality Provision does not clearly and

---

[3] *See Pa. State Conf. of NAACP Branches v. Sec'y Commw. of Pa.*, 97 F.4th 120 (3d Cir. 2024).

[4] This would match the skepticism courts have recently had for similar language in Section 2 of the Voting Rights Act. Just as the Materiality Provision prohibits any "person acting under color of law" from "deny[ing] the right of any individual to vote" for an immaterial error, 52 U.S.C. § 10101(a)(2)(B), Section 2 prohibits "any State or political subdivision" from imposing a "voting qualification or prerequisite to voting . . . which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color," 52 U.S.C. § 10301(a). Members of the Supreme Court have doubted "that the Voting Rights Act of 1965 furnishes [a private] cause of action under § 2." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 690 (2021) (Gorsuch, J., concurring) (citation omitted). And the Eighth Circuit recently ruled that "Congress did not speak with a 'clear voice' that manifests an 'unambiguous' intent to confer [an] individual right[]" in Section 2. *Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710, 719 (8th Cir. 2025) (quoting *Gonzaga*, 536 U.S. at 280), *vacated*, 2026 WL 1967126 (8th Cir. July 7, 2026).

unambiguously convey an individual federal right.[5] It is not phrased in terms of the persons benefited and contains no rights-creating language: the subject of the Provision is any "person acting under color of law," and the object is "the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B).

And if the Materiality Provision conveys any right, it is *public*, not private. "[Private] rights inhere in the individual; they are 'individually focused'; they create 'individual entitlements.'" *Three Rivers Ctr. for Indep. Living v. Hous. Auth. of Pittsburgh*, 382 F.3d 412, 419 (3d Cir. 2004) (quoting *Gonzaga*, 536 U.S. at 287); *see also id.* n.9. "[I]n contrast, the term 'public rights' refers to duties owed collectively to the community." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 448 n.2 (2021) (Thomas, J., dissenting). These duties "often have a 'systemwide' or 'aggregate' focus; are defined in terms of obligations of the person or entity regulated rather than in terms of entitlements of the individual protected; [and] are 'not concerned with whether the needs of any particular person have been satisfied.'" *Three Rivers*, 382 F.3d at 419 (quoting *Gonzaga*, 536 U.S. at 281, 288).[6] Here, that duty would be a prohibition on state actors' throwing out voting documents with immaterial errors, not an individual entitlement to the

[5] Two circuit panels have reached the opposite conclusion. *Schwier v. Cox*, 340 F.3d 1284, 1296–97 (11th Cir. 2003); *Vote.Org v. Callanen*, 89 F.4th 459, 474–75 (5th Cir. 2023). But the former relied in part on *Blessing*, *see Schwier*, 340 F.3d at 1296–97, and the latter relied in part on the former, *see Callanen*, 89 F.4th at 475.

[6] Justice Thomas has similarly defined "public rights" as "rights that involve duties owed 'to the whole community, considered as a community, in its social aggregate capacity.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring) (quoting 4 William Blackstone, *Commentaries* *5).

opposite. As *Gonzaga* provides that Section 1983 may be used only to enforce private rights, *see* 536 U.S. at 286, the Plaintiffs should not have been able to bring suit here.

**2.**

As Ritter's new arguments show, we should also interpret the Materiality Provision in the context of the right it seeks to protect: the franchise. Case law has equivocated on whether the Constitution guarantees an individual right to vote.[7] But "rights themselves are based on and justified by what is due to each as members of a political community." Adrian Vermeule, *Common Good Constitutionalism* 128 (2022).[8] While, by nature, a free people have an inalienable collective right to choose their rulers, there is no indefeasible individual right to vote. Only citizens who can demonstrate virtue are due the franchise in a state oriented toward the common good.

Our legal tradition has always recognized the collective right of a people to choose their own leaders. "[A] commonwealth is the *property of a people* . . . . associated in an agreement with respect to justice and a partnership for the common good." Marcus Tullius Cicero, I *De re publica* ch. 25 (Clinton W. Keyes trans., 1928) (emphasis added).

---

[7] *Compare, e.g.*, *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."); *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) ("Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections."), *with San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 36 n.78 (1973) ("[T]he right to vote, per se, is not a constitutionally protected right . . . ."); *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam) ("The individual citizen has no federal constitutional right to vote for electors for the President of the United States . . . .").

[8] "[R]ight is the object of justice," St. Thomas Aquinas, *Summa Theologica*, pt. II-II, q. 57, art. 1 (Fathers of the English Dominican Province trans., 1947), and "justice is a habit whereby a man renders to each one his due," *id.* q. 58, art. 1.

A sovereign's authority is legitimate when "the people transfer to him and confer upon him the whole of their own sovereignty and power." I *Digest of Justinian* § IV.1 (Ulpian, *Institutes* 1) (Charles H. Monro trans., 1904). "[P]olitical power considered in general, not descending in particular to Monarchy, Aristocracy, or Democracy, comes directly from God alone," but "Divine law gives this power to no particular man, therefore Divine law gives this power to the collected body." St. Robert Bellarmine, *De Laicis*, ch. 6 (Kathleen E. Murphy trans., 1928).

Yet a citizen must be virtuous to participate in the political community. Athenian democracy did not "train[ ] the citizens in such fashion that they looked upon insolence as democracy, lawlessness as liberty, impudence of speech as equality, and licence to do what they pleased as happiness, but rather . . . detested and punished such men and by so doing made all the citizens better and wiser." Isocrates, *Areopagiticus* § 20 (George Norlin trans., 1929). For "what can be nobler than the government of the State by virtue? For then the man who rules others is not himself a slave to any passion, but has already acquired for himself all those qualities to which he is training and summoning his fellows. Such a man imposes no laws upon the people that he does not obey himself . . . ." Cicero, *supra*, at ch. 34. That is why our "[r]epublican government presupposes the existence of [virtue] in a higher degree than any other form" of government, for if there is "not sufficient virtue among men for self-government . . . nothing less than the chains of despotism can restrain them from destroying and devouring one another." *The Federalist* No. 55, at 346 (James Madison) (Clinton Rossiter ed., 1961).

And when a citizen failed to demonstrate virtue, his access to the franchise would be restricted. The office of censor was established to "regulat[e] the conduct and morals of Rome" and endowed the "power of honouring and degrading" the citizenry. Livy, *Ab Urbe Condita* § 4.8.1 (Rev. Canon Roberts trans., 1912). A degraded Roman was reduced in rank and could lose his voting privileges. *See id.* § 39.42. The English tied virtue to property and restricted the franchise in county elections to men holding freehold land worth at least "Forty Shillings by Year." 8 Hen. VI c. 7 (1429). It was reasoned that this would "exclude such persons as are in so mean a situation that . . . . they would be tempted to dispose of [their votes] under some undue influence or other," as it could "hardly be expected [that a] person[ ] of indigent fortune[ ]" would "give his vote freely and without influence of any kind." 1 William Blackstone, *Commentaries* *171. That is why our Nation has always regarded the individual right to vote "not . . . strictly as a natural right, but as a privilege merely conceded by society, according to its will, under certain conditions." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). And why there have always been exclusions "on the ground of want of capacity or of moral fitness" of those who "lack either the intelligence, the virtue, or the freedom of action essential to the proper exercise of the elective franchise." Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 29 (1st ed. 1868). The conclusion follows that there is no individual right to vote.

This background informs the best reading of the Materiality Provision, which was designed to "provide 'greater protection for the right to vote.'" Michael T. Morley, *Voting Rights: Litigating Materiality Under the Civil Rights Act*, 76 Fla. L. Rev. 1807, 1818–19

(2024) (quoting President John F. Kennedy, *Report to the American People on Civil Rights* (CBS television broadcast June 11, 1963)); *see also Pa. State Conf. of NAACP Branches v. Sec'y Commw. of Pa.*, 97 F.4th 120, 126 (3d Cir. 2024) (*Pa. NAACP*). If the right to vote is collective, how could the Materiality Provision provide a private right not to have a ballot thrown out for an immaterial error when that remedy is notably absent from the statute? "Private plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with [the] law." *TransUnion*, 594 U.S. at 429 (citation omitted). The Attorney General may bring suit against any of the several States to vindicate an interest related to the collective right to vote. But I would find no such private right of action granted to the Plaintiffs.

**B.**

The second issue on which Ritter flipped was the applicability of the Materiality Provision, an issue we have already had occasion to reconsider. After the 2022 election, the Pennsylvania NAACP sued in federal court, alleging that Pennsylvania's ballot dating requirement violated the Materiality Provision. *Pa. NAACP*, 97 F.4th at 128. By the time the case came before us for review, we noted that our controlling precedent had been "vacated as moot by the Supreme Court." *Id.* (citing *Ritter*, 143 S. Ct. 297). And upon revisiting the question, we decided that "the date requirement for casting a mail-in ballot is not covered by, and thus does not violate, the Materiality Provision." *Id.* at 139. Drawing directly from Justice Alito's dissent from denial of stay in this litigation, we found it "implausible that federal law bars a State from enforcing vote-casting rules that it

has deemed necessary to administer its elections." *Id.* at 135 (citing *Ritter*, 142 S. Ct. at 1824 (Alito, J., dissenting from denial of stay)).

In my 2022 concurrence, I noted these concerns but wrote that the appellees' poor briefing meant "[t]hose questions are for tomorrow." *Cohen*, 36 F.4th at 166. Tomorrow arrived in *Pennsylvania NAACP*, settling the matter.

## III.

Notwithstanding the vacatur of the panel's 2022 decision, we must now decide whether the Plaintiffs are entitled to an award of "a reasonable attorney's fee" as the "prevailing party." 42 U.S.C. § 1988(b). I agree with the majority that the Plaintiffs meet the exceptionally generous standards for "prevailing" outlined in case law, even while doubting the merits of their position. But I would find that special circumstances should nonetheless prevent them from a fee recovery, as Section 1988 fee-shifting should only apply to "private attorneys general" seeking to enforce civil rights law on behalf of themselves and others, not to opportunistic litigators seeking to change it for the benefit of non-party groups. I would also find that the District Court abused its discretion by failing to recognize the limited degree of success the Plaintiffs obtained, and I would remand on that basis.

### A.

As early as the 1940s, courts recognized the concept of a private attorney general: "any person, official or not," whom "Congress [has] empower[ed] . . . to institute a proceeding . . . to vindicate the public interest." *Associated Indus. of N.Y. State v. Ickes*, 134 F.2d 694, 704 (2d Cir.), *vacated for mootness*, 320 U.S. 707 (1943). To encourage

suits under the Civil Rights Act, Congress included a fee-shifting provision providing that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 2000a-3(b). The Supreme Court recognized that if a Title II plaintiff "obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968) (footnote omitted). Therefore, "[i]t follows that one who succeeds in obtaining an injunction under that Title should ordinarily recover an attorney's fee unless *special circumstances* would render such an award unjust." *Id.* (emphasis added). This established the two principles of the private attorney general: he must seek to vindicate his own interests as well as those of others, and he must do so via the enforcement of existing law.

After *Piggie Park*, some courts began to permit equitable fee shifting for civil rights plaintiffs without statutory authorization. *See, e.g.*, *Lee v. S. Home Sites Corp.*, 444 F.2d 143, 143 (5th Cir. 1971); *Incarcerated Men of Allen Cnty. Jail v. Fair*, 507 F.2d 281, 286 (6th Cir. 1974). So the Supreme Court stepped in to reassert the "general 'American rule' that the prevailing party may not recover attorneys' fees as costs or otherwise." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245 (1975). "[C]ourts are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation . . . . Nor should the federal courts purport to adopt on their own initiative a rule awarding attorneys' fees based on the private-attorney-general approach . . . ." *Id.* at 269. The general rule persisted: "allowances for counsel

fees are limited to the sums specified by . . . statute," *id.* at 255, and "the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine," *id.* at 262 (footnote omitted). Congress responded with the Civil Rights Attorney's Fees Awards Act of 1976—codified at 42 U.S.C § 1988(b)—which allows "the prevailing party" in various civil rights actions, including Section 1983, "a reasonable attorney's fee." But even so, courts could continue to deny fee-shifting in special circumstances. *See* note 12, *infra*. Section 1988(b) is thus best read as a discrete carveout-with-a-carveout from the principles of *Piggie Park* and *Alyeska*, leaving the default American rule undisturbed in most civil actions. Taken together, Congress understood private attorneys general to be those who sought to enforce the law for themselves and others, not those who sought to change it for the benefit of groups not party to the litigation.

**B.**

Outside interests, not individual concerns, drove this litigation. The American Civil Liberties Union (ACLU) entered an appearance not because each nominal plaintiff had some individual weighty interest. Rather, the case—and why the Department of Justice, the Pennsylvania Attorney General, various state legislators, a federal senate campaign, and several election litigation nonprofits all weighed in as amici before us and the Supreme Court—concerned political parties perpetually battling over the future of the Commonwealth. These repeat players were more than happy to use the Plaintiffs as vessels to force an advantage in future elections. It is a practice that now goes by many

names: "impact litigation,"[9] "strategic litigation,"[10] "law reform litigation,"[11] and more. Whatever the name, it is distinct from the private-attorney-general concept that Section 1988(b) was designed to reward.

Champerty—support of a case by a party not naturally concerned so that it may reap the reward of a victory—was long "odious, in the eyes of the law." *Wheeler v. Pounds*, 24 Ala. 472, 473 (1854). "[G]reat pains have been taken by those who in times past had charge of the law to deter men from reckless litigation," IV *The Institutes of Justinian*, tit. 16 (John B. Moyle trans., 1913), so the common law traditionally did not allow nonparties to "maintain[] the one side, without having any part of the thing in Plea or Suit," 1 Edward Coke, *Institutes of the Laws of England* 368b–69a (1628). Blackstone likewise described a criminal offense of "officious intermeddling in a suit that no way belongs to one," as such practice "keeps alive strife and contention." 4 William Blackstone, *Commentaries* *134–35. Modern doctrine has largely done away with the prohibition against champerty. *See* 14 Am. Jur. 2d *Champerty, Maintenance, Etc*. § 1. Yet in very rare circumstances, the doctrine still has teeth. For instance, a class action may be

---

[9] Catherine R. Albiston & Laura Beth Nielsen, *Funding the Cause: How Public Interest Law Organizations Fund Their Activities and Why It Matters for Social Change*, 39 L. & Soc. Inquiry 62, 64 (2014) ("[I]mpact litigation[ is] the strategy of bringing a lawsuit specifically to establish an important legal right or principle.").

[10] John N. Tye & Morgan W. Williams, *Networks and Norms: Social Justice Lawyering and Social Capital in Post-Katrina New Orleans*, 44 Harv. C.R.-C.L. L. Rev. 255, 264 (2009) ("In the classic model, impact litigation is lawyer-driven strategic litigation meant to establish social justice norms as law.").

[11] Carol M. Rose, *Coming to Terms with Terminology: Evaluating Law Reform*, 31 Stan. L. Rev. 977, 977 (1979) ("[L]aw reform [litigation] . . . . is a kind of political drama: the big-issue litigation, wide-ranging, bold and exciting, affecting broad classes of persons and confronting huge government bureaucracies.").

denied certification if the court suspects "[t]he named plaintiffs are no more than figureheads or puppets being manipulated by persons not named as plaintiffs," as such a suit is "mar[red]" with "the taint of collusion[ and] champerty." *Miller v. Calvin*, Civil Action No. 82-C-2253, 1984 U.S. Dist. LEXIS 21057, at *5, 26 (D. Colo. Dec. 20, 1984).

That is why Section 1988 has a safety valve when such circumstances exist that "it is clear that the reasonable fee is no fee at all." *Farrar v. Hobby*, 506 U.S. 103, 118 (1992) (O'Connor, J., concurring).[12] Congress understood Section 1988 as a reward for private attorneys general: that is, those who vindicated their own and others' rights by enforcing existing civil rights law. Here, the Plaintiffs did not seek to enforce the law. They sought to change it, and only momentarily succeeded. Their interests are marginal, much like those of the named plaintiffs in a class action. *See generally In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712 (3d Cir. 2023). And just as the primary beneficiary of a class action is the plaintiffs' law firm, the primary beneficiaries of this action are the political interests that sustained the case. Case law may have done away with the champerty doctrine to allow for class actions, but I see no evidence Congress did the same for impact litigation in Section 1988.

---

[12] For instance, we have implied that special circumstances may preclude a fee recovery when a defendant causes a constitutional violation due to events beyond its control, *Staten v. Hous. Auth. of Pittsburgh*, 638 F.2d 599, 605 n.13 (3d Cir. 1980), or when a party has only prevailed by obtaining a nuisance settlement, *Ashley v. Atl. Richfield Co.*, 794 F.2d 128, 134 n.9 (3d Cir. 1986).

**C.**

Finally, and again with respect to the diligent work of the District Court, I would vacate the decision and remand because the Plaintiffs obtained only part of the relief they sought. A prevailing party's fee award must be adjusted to reflect the degree of success in the litigation, and "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). This product, known as the "lodestar," can be "adjust[ed] . . . downward if [it] is not reasonable in light of the results obtained." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (citing *Hensley*, 461 U.S. at 434–37). "[W]here the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Hensley*, 461 U.S. at 440.

The Plaintiffs fell far short of the "impact" they sought. Their request was wide-ranging, including a "[d]eclaration that enforcement of the handwritten date requirement . . . [v]iolates the Materiality Provision of the Civil Rights Act" and "[i]njunctive relief preliminarily and permanently enjoining" the LCBE from "[c]ertifying the 2021 election in Lehigh County without counting [the contested] mail-in ballots." Compl. *20–21, *Migliori v. Lehigh Cnty. Bd. of Elections*, No. 22-cv-397 (E.D. Pa. Jan. 31, 2022), ECF No. 1. They succeeded only in the latter, and only temporarily, winning no permanent declaratory relief. But the former was the real relief they sought, as illustrated by the identical suit filed by the same ACLU attorneys as here, again seeking a declaratory judgment that Pennsylvania's ballot dating requirement violated the

Materiality Provision. Because of their failure in this case and in that one, we have since decided the issue in precisely the opposite direction. *Pa. NAACP*, 97 F.4th at 139.

The Report and Recommendation adopted by the District Court did not recognize the limited relief the Plaintiffs obtained, *Migliori v. Lehigh Cnty. Bd. of Elections*, No. 22-cv-397, 2025 WL 2493843, at *2 n.5 (E.D. Pa. May 19, 2025), and that was legal error. *See Washington v. Phila. Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1043 n.9 (3d Cir. 1996) ("When a trial court gives weight to improper considerations it . . . commits legal error." (quoting *Cunningham v. City of McKeesport*, 753 F.2d 262, 268 (3d Cir. 1985))). While "[w]e review the reasonableness of an award of attorney's fees for an abuse of discretion," *id.* at 1034 (citing *Rode*, 892 F.2d at 1182), "[t]he question of what standards to apply in calculating an award of attorneys' fees is a legal question" over which "we exercise plenary review," *id.* (citation omitted). So I would vacate the decision and remand with instruction to consider the limited relief the Plaintiffs achieved.

* * *

Both our decided law and the classical tradition indicate that there is no individual right conveyed by the Materiality Provision. And even if there were, we have since decided that Pennsylvania's ballot dating requirement does not violate that right. Because the Plaintiffs failed to induce this Court to rule otherwise, I would remand for consideration of the limited success that they obtained. And I encourage future matters to be scrutinized with a critical eye on impact litigators to determine whether they ought to be rewarded under Section 1988.